Arthur Russell (AR 0506)
Attorney at Law
14 Wall Street, 22nd Floor
New York, NY 10005-2101
Telephone: (212) 732-7800
Facsimile:  (973) 661-4646
e-mail: arthur@attorneyrussell.com

ROBERT TED PARKER (RP 5369)
PARKER LAW FIRM
7 Mira Loma Road
Orinda, California 94563
Telephone:  (415) 412-1615
Facsimile:  (925) 254-8011
Email:  tedparkerlaw@gmail.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x

| | |
|---|---|
| BARBARA J. FRIED and B. MARK FRIED; ALTITUDE PARTNERS, LLC; RICHARD D. MALTZMAN, AS TRUSTEE FOR THE RICHARD D. & CHARLENE MALTZMAN FAMILY TRUST U/A/D 3/23/88; JEFFOREED PARTNERS, L.P.; ZELFAM, LLC; ALAN GERBER LEWIS MARITAL IRR. TRUST; ALEX KHOWAYLO; BARRY ARONOFF; BILL NEWLIN; BILL SCHMUHL; BUKFENC LLC; CATLIN FAMILY TRUST; CHARCO VENTURES, L.P.; DANIEL R. & ELISABETH S. PFAU; DECKTOR FAMILY TRUST (LESLIE & FAITH DEKTOR); DONALD LEFTON; DREW PERKINS TRUST U/A/D 12/21/99; ELI BARKAT HOLDING LTD; ERIK SCULTE; FRANK KEENER; FRANK RUTAN; GEORGE EVANS; GSB HOLDINGS, INC; IRACINI L.P.; JAMES J. AND SUSAN E. VAN STONE; JAMES R AND MARGARET W DOUGLASS; JEFF MOSTER; JEFFREY HECKTMAN TRUST; JOHN ARGUE; JOHN DRAGHI; JOHN ROSEKRANZ; KAREN A. UBELHART; LOUISE E. COHEN; MARTIN BURGER; MICHAEL & DIANE BRANON REVOCABLE TRUST; MICHAEL SHER & | Civil Case No.: 1:09-cv-09100-BSJ-KNF<br>**[PROPOSED]**<br>**SECOND AMENDED COMPLAINT FOR SECURITIES FRAUD AND BREACH OF FIDUCIARY DUTY**<br><br>**<u>Jury Trial Demanded</u>**<br><br><br><br># <u>EXHIBIT 1</u><br># <u>to Parker Declaration on</u><br># <u>Motion to Amend</u> |

---

BILLIE GELB; NIR BARKAT HOLDING
LTD; PAUL DEKTOR; PEACHBLOW
PARTNERS, L.P.; PROVIDENT HOLDINGS,
INC.; PSERD TRUST; RFLP GROUP, LLC;
RICHARD & RICKEL SHUSTER; RICHARD
LANDGARTEN; ROBERT T. FRALEY
TRUST; ROSS C. HARTLEY; RUSSELL
AND JUDITH FRADIN, TIC; SANFORD H.
ROBBINS; SHLOMO & ATALYA
SHMELZER; SIMON FAMILY INVEST.
PARTNERSHIP; STEPHANIE BORYNACK;
STEPHEN & KATHLEEN GUERINO;
STEVE HOLDER; TAD LOWREY; THE
GOLD/SHERMAN-GOLD FAMILY TRUST;
THOMAS G. MACEY; THREE HORSE
INVESTMENTS; VAHID MANIAN; WAITE
FAMILY TRUST; WILLIAM C. SCOTT;
YUVAL 63 HOLDING (1995) LTD.,

                              Plaintiffs,

                - vs -

LEHMAN BROTHERS REAL ESTATE
ASSOCIATES III, L.P.; LEHMAN
BROTHERS PRIVATE EQUITY ADVISERS,
LLC; REAL ESTATE PRIVATE EQUITY,
INC.; LEGACYCO ADVISOR; MANAGECO;
MARK A. WALSH; MARK H. NEWMAN;
BRETT BOSSUNG; MICHAEL J. ODRICH;
CHRISTOPHER M. O'MEARA; RICHARD S.
FULD, JR.; JOSEPH M. GREGORY; ERIN
CALLAN; IAN LOWITT; THOMAS RUSSO;
AND DOES 1 through 50,

                              Defendants.

# Table of Contents

**Page**

SUMMARY OF THE CASE ...................................................................................................... 2

THE PARTIES ...................................................................................................................... 10

    Role of General Partner, Investment Advisor and REPE ...................................... 13

    Role of Mark A. Walsh ................................................................................................ 14

    Role of Brett Bossung ................................................................................................. 14

    Role of Mark H. Newman ........................................................................................... 14

    Additional Allegations on Walsh, Bossung, Newman, LegacyCo and ManageCo .............. 15

    The "Consent" Election for Transfer from Lehman and Additional Fees ............................ 16

    Role of Christopher M. O'Meara ............................................................................... 17

    Role of Richard S. Fuld, Jr. ......................................................................................... 17

    Role of Joseph M. Gregory .......................................................................................... 18

    Role of Erin Callan ...................................................................................................... 18

    Role of Ian Lowitt ........................................................................................................ 18

    Role of Michael J. Odrich ........................................................................................... 19

    Role of Thomas Russo ................................................................................................. 19

    Further Joint Allegations on Lehman Insider Defendants .................................... 20

JURISDICTION AND VENUE .......................................................................................... 23

STATEMENT OF FACTS ................................................................................................... 24

    Misrepresentations in the Private Placement Memoranda ("PPM") ...................... 25

    Misrepresentations in the Limited Partnership Agreements. .............................. 40

    Participation of Other Co-Conspirators .................................................................. 41

    The Gambit of "Future Investments" ....................................................................... 42

    Lehman Brothers and the 2008 Economic Climate ............................................... 45

    The May 28th Transfers of "Underwater" Lehman Property Investments ........................ 48

    The Delay in Disclosing the Transactions ............................................................... 49

    The "Interested" Transactions and Investment Advisors' Act of 1940 ...................... 52

    The General Partner's Failure to Seek Approval of the Transactions ...................... 54

    GAAP Principles and "Mark to Market" Obligations ......................................... 56

    No Independent Review of Property Valuations ..................................................... 58

    Undisclosed Amounts Required by the Transactions .............................................. 60

CLAIMS FOR RELIEF ....................................................................................................... 66

COUNT I ............................................................................................................................. 66

      (Section 10(b) of the 1934 Securities Exchange Act and Rule 10b5) ...................... 66

COUNT II ............................................................................................................................ 68

(Rescission Under Securities Exchange Act Of 1934, Section 29(B)) .............................. 68

COUNT III ......................................................................................................................... 70

(Violation Of Section 20 Of The Exchange Act, Against Defendants Walsh, Bossung, Newman, Fuld, Gregory, O'meara, Odrich, Callan Russo And Littow) ........... 70

COUNT IV .......................................................................................................................... 71

(Bad Faith Breaches Of Fiduciary Duty Under New York And Delaware Law) .............. 71

COUNT V ........................................................................................................................... 73

(Violation Of Delaware Securities Anti-Fraud Statute, 6 Del. C. § 7303) ........................ 73

COUNT VI ........................................................................................................................... 73

(Fraudulent Misrepresentation Under New York Law) ..................................................... 73

COUNT VII ......................................................................................................................... 75

(Concealment Under New York Law) ............................................................................... 75

COUNT VIII ........................................................................................................................ 76

(Willful Breach Of Covenant Of Good Faith And Fair Dealing) ..................................... 76

COUNT IX ........................................................................................................................... 76

(Aiding And Abetting Fraud Violations, Against Defendants Walsh, Bossung, Newman, Fuld, Gregory, O'meara, Odrich, Callan, Russo, And Littow) ........................ 76

COUNT X ............................................................................................................................ 78

(Fraud And Contract Breach Under N. Y. Law Against Defendants Walsh, Bossung, Newman, GENERAL PARTNER, Investment Advisor, Repe, Legacyco Advisor, Manageco) ......................................................................................................... 78

COUNT XI ........................................................................................................................... 80

(Declaratory Relief Concerning Management Fees Against General Partner, Investment Manager, Repe, Walsh, Bossung, Newman, Legacyco Advisor, Manageco) ......................................................................................................................... 80

COUNT XII .......................................................................................................................... 81

(Negligence) ...................................................................................................................... 81

COUNT XIII ......................................................................................................................... 82

(Alternative Derivative Claim) .......................................................................................... 82

JURY DEMAND AND PRAYER FOR RELIEF ................................................................ 82

PLAINTIFFS BARBARA J. FRIED and B. MARK FRIED; ALTITUDE PARTNERS, LLC; RICHARD D. MALTZMAN, TRUSTEE FOR RICHARD D. & CHARLENE MALTZMAN FAMILY TRUST U/A/D 3/23/88; JEFFOREED PARTNERS, L.P.; ZELFAM, LLC; ALAN GERBER LEWIS MARITAL IRR. TRUST; ALEX KHOWAYLO; BARRY ARONOFF; BILL NEWLIN; BILL SCHMUHL; BUKFENC LLC; CATLIN FAMILY TRUST; CHARCO VENTURES, LP; DANIEL R. & ELISABETH S. PFAU; DECKTOR FAMILY TRUST (LESLIE & FAITH DEKTOR); DONALD LEFTON; DREW PERKINS TRUST U/A/D 12/21/99; ELI BARKAT HOLDING LTD; ERIK SCULTE; FRANK KEENER; FRANK RUTAN; GEORGE EVANS; GSB HOLDINGS, INC; IRACINI L.P.; JAMES J. AND SUSAN E. VAN STONE; JAMES R AND MARGARET W DOUGLASS; JEFF MOSTER; JEFFREY HECKTMAN TRUST; JOHN ARGUE; JOHN DRAGHI; JOHN ROSEKRANZ; KAREN A. UBELHART; LOUISE E. COHEN; MARTIN BURGER; MICHAEL AND DIANE BRANON REVOCABLE TRUST; MICHAEL SHER & BILLIE GELB; NIR BARKAT HOLDING LTD; PAUL DEKTOR; PEACHBLOW PARTNERS, L.P.; PROVIDENT HOLDINGS, INC.; PSERD TRUST; RFLP GROUP, LLC; RICHARD & RICKEL SHUSTER; RICHARD LANDGARTEN; ROBERT T. FRALEY TRUST; ROSS C. HARTLEY; RUSSELL AND JUDITH FRADIN, TIC; SANFORD H. ROBBINS; SHLOMO & ATALYA SHMELZER; SIMON FAMILY INVEST. PARTNERSHIP; STEPHANIE BORYNACK; STEPHEN & KATHLEEN GUERINO; STEVE HOLDER; TAD LOWREY; THE GOLD/SHERMAN-GOLD FAMILY TRUST; THOMAS G. MACEY; THREE HORSE INVESTMENTS; VAHID MANIAN; WAITE FAMILY TRUST; WILLIAM C. SCOTT; YUVAL 63 HOLDING (1995) LTD. (together, "**Plaintiffs**"), each as limited partners of one of the following Delaware limited partnerships, Lehman Brothers Real Estate Partners III, L.P. ("Partners III"), Lehman Brothers Real Estate Fund III, L.P. ("Fund III"), Lehman Brothers Offshore Real Estate Fund III ("Offshore III") and Lehman Brothers Real Estate Capital Partners III ("Capital III")(together the "**Partnerships**") allege for their Second Amended Complaint against defendants LEHMAN BROTHERS REAL ESTATE ASSOCIATES III, L.P. and any and all successor entities

("**General Partner**" or "**Lehman GP**"), LEHMAN BROTHERS PRIVATE EQUITY
ADVISERS, LLC and any and all successor entities ("Investment Advisor"), and REAL
ESTATE PRIVATE EQUITY, INC. ("REPE") and any and all successor entities, each an
affiliate of bankrupt Lehman Brothers Holdings, Inc. ("Lehman"), LEGACYCO ADVISOR
("LegacyCo"), MANAGECO ("ManageCo"); and individuals MARK A. WALSH, BRETT
BOSSUNG, MARK H. NEWMAN, MICHAEL J. ODRICH, CHRISTOPHER M. O'MEARA,
RICHARD S. FULD, JR., JOSEPH M. GREGORY, ERIN CALLAN, IAN LOWITT AND
THOMAS RUSSO (collectively, "Insider Defendants") and DOES 1 through 50, (all defendants,
collectively, "**Defendants**").

The allegations herein are based upon personal knowledge, or information and belief
based on the continuing investigation of their counsel.  Some facts alleged herein are derived
from the Report of Anton R. Valukas, Examiner, appointed by the U.S. Bankruptcy Court on
January 16, 2009 under 11 U.S.C. §1106(a)(3) and (4), which Report was published March 11,
2010 (herein, the "**Examiner's Report**").  Many facts related to Plaintiffs' allegations are known
only to Defendants or are exclusively within their control.  Substantial evidentiary support
herefor will be developed after reasonable discovery.

## SUMMARY OF THE CASE

1.      Plaintiffs collectively committed to invest at least $53,750,000 as limited partners
of the Partnerships, and have joined together to seek damages for losses incurred due to
Defendants' misrepresentations of their investment intentions, due to intentional omissions to
disclose their scheme to use Plaintiffs' funds to acquire legacy real estate long-held by Lehman,
during its financial crisis, at prices far above Fair Value, without adequate disclosure or informed
consent.  Said misrepresentations and omissions were made in very similar Private Placement
Memoranda ("PPMs") related to sales of limited partnership interests in eleven Lehman real
estate limited partnerships, including the Partnerships, that collectively operated as a single entity
for all practical purposes under the name Lehman Brothers Real Estate Partners III ("**LBREP**

**III**").  A sample PPM is attached as **Annex A.**  Plaintiffs here allege violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), SEC Rule 10b-5; bad faith breach of fiduciary duty,  the Delaware securities anti-fraud statute; and common law claims for fraud and breach of contract, including Sections 6.8, 6.13 and 8.1 of the Limited Partnership Agreements ("LPAs") for the Partnerships.  An LPA for Fund III is attached as **Annex B**.  LPAs for all Parallel Funds are essentially identical in all material respects incident to this litigation.

      2.     The commercial real estate market worldwide declined substantially from mid-2007 through 2008.  While others booked sizable real estate losses in 2007, Lehman recorded only modest writedowns, despite having multiplied its high exposure to real estate investments that year with highly-leveraged and unadvised purchases.  Lehman's real estate portfolio held for sale grew from $9.4 billion as of its 2006 year-end to over $21.9 billion at its 2007 year-end.  As the real estate market declined in 2007, Lehman failed to adequately write down these assets and continued to overvalue them in violation of Generally Accepted Accounting Principles ("GAAP").  Lehman's situation was aggravated by very high leverage and reliance on short-term debt financing.  Although commercial banks may not leverage their assets-to-equity ratio by more than 15-to-1 for safety reasons, Lehman's leverage ratio was more than double that amount, and rose to an estimated 44-times equity, according to a well-respected financial authority, David Einhorn (L. McDonald, "*A Colossal Failure of Common Sense,*" p.287, Crown Publ., 2009).  With such high leverage, "a mere 3.3% drop in the value of assets wipes out the entire value of equity and makes the company insolvent," according to Luigi Zingales, Professor of Finance, University of Chicago. (*Id.*).  Lehman's failure to write down its real estate holdings as required by GAAP was due to Defendants' desire to conceal Lehman's virtual insolvency long before its bankruptcy on September 15, 2008.

      3.     The PPMs were issued to prospective investors in LBREP III commencing in October, 2007 and continuing thereafter, during the broad market decline. The Examiner reports that, within Lehman, Walsh was authorizing "significant write-downs" of commercial real estate

held for Lehman's own account during October 2007 due to "ugly" market conditions (at 227). Yet the PPMs uniformly spoke only of future market opportunities, and stated that Lehman's experts would, at a later date, identify and evaluate the "*investments to be made by LBREP III,*" but omitted relevant material facts. The PPMs represented that Lehman's team would "*monitor changing economic conditions, anticipate the impact on real estate markets and act quickly and decisively on compelling investment opportunities.*" Investment decisions would aim to maximize the value of LBREP III assets and "to provide its investors with attractive risk-adjusted returns." But these statements omitted the material fact that Defendants intended to transfer legacy Lehman properties to LBREP III along with their accumulated losses. The PPMs also omitted to state that, for Lehman itself, during that same month of October 2007, "transactions have slowed to a trickle due to uncertainty around financing, valuation (stalemate), and weakening of economic forecasts" (Examiner's Report, 228). The Examiner elsewhere reports that, "later in 2007, [Lehman] stopped doing new commercial real estate deals." (at 118). The PPMs stated that the "General Partner will create an Investor Advisory Committee" that is "unaffiliated with the General Partner"(PPM at Section V, p.27) and the LPAs said the "General Partner shall endeavor in good faith to appoint members . . . who, as a group, are representative of the Limited Partners." (LPAs Section 6.8(c)). The PPMs and LPAs both stated that the IAC would objectively review transactions in which the General Partner had conflicts of interest, and would also be consulted concerning any write-downs of property valuations. But they omitted to state that Defendants would not form an IAC until after the transfers had been made.

      4.     The omissions in the PPMs were "group-published information," resulting from the efforts of all Defendants in outlining, drafting, reviewing, revising and publishing the PPM contents for promulgation to investors such as Plaintiffs. On information and belief, based on their respective positions and functions in and for Lehman and the General Partner, (i) Defendants Fuld, Gregory, Walsh and Odrich formulated the overall plan for Lehman to "warehouse" real estate investments for subsequent transfer to the Partnerships and outlined to

ATL_IMANAGE-6887589.1

subordinate Lehman officials how the PPMs should describe what was to be done with investors' money; (ii) Defendants O'Meara, Callan and Lowitt compiled the financial information regarding Lehman's property investments, the market information regarding the overall market decline, the loss positions represented by most of the Subject Investments to be transferred to the Partnerships, and then decided to largely disregard GAAP principles regarding write-downs of investment valuation, supported the effort to conceal the fact, known to them, that investors would inevitably inherit Lehman's losses upon their initial investment, and continued that concealment by deciding, with the concurrence of all other Defendants, to omit the LPA-required 2nd Quarter 2008 financial statement to investors which would have disclosed the true facts of the losses; (iii) Defendants Walsh, Bossung and Newman managed the Lehman real estate investment activity and made the actual approvals and purchases of Lehman properties to be "warehoused," and thus intimately knew the financial information regarding the properties, the market information regarding the overall market decline, the loss positions represented by most investments to be transferred to the Partnerships, and thereafter directly managed the marketing of limited partnership interests to investors with the PPMs which they helped write, which omitted the fact, known to them, that investors would inevitably inherit Lehman's losses upon their initial investment, and thereafter supported the further concealment by deciding, with the concurrence of all other Defendants, to omit the LPA-required 2nd Quarter 2008 financial statement to investors which would have disclosed the true facts of the losses; (iv) Defendant Russo led was the legal team that helped write the PPMs and LPAs and passed judgment on the legal sufficiency of those documents, who either knew of the misrepresentations or omissions of material facts, or should have known thereof but recklessly failed in the duty to conduct legal due diligence to learn and disclose all material facts that investors would consider of substantial importance concerning the Partnership interests, and failed to disclose the fact that investors could inherit Lehman's losses upon their initial investment, and thereafter supported the further concealment by disregarding the LPA-required 2nd Quarter 2008 financial statement to investors

which would have disclosed the losses unless Insider Defendants deceptively altered accounting practices to conceal losses.

5.       As Defendants well knew, these PPM omissions were misleading as to the Partnerships' goals, management and prior results, since Lehman had long before, near the market's top, made the acquisitions of properties that they intended to later transfer to the Partnerships, in self-dealing transactions at prices that would instantly evaporate 30% of Plaintiffs' capital without their knowledge or consent.  The PPMs were silent about the nature of such transfers. The LPAs stated that Lehman-owned properties "may be transferred" to Partnerships at "acquisition cost plus cost of carry" *provided that* investor consent were obtained, but omitted the fact that investors would thereby inherit a loss from properties Lehman acquired well before the Partnerships were even formed.  Defendants knew this fact from the Lehman property records of inventory, such as its quarterly "Valuations Summary & Assumptions," or its document titled "LBREP III: Investments in Progress, *33 Investments Aggregating $1.3 Billion of Committed Equity,"* (together, and with other similar documents *not* yet produced, "Portfolio Records") produced in a 2009 books and records action brought by Plaintiffs in the Delaware Court of Chancery.  Further, as omitted from the PPMs, no independent committee would be formed to weigh the unfairness to LBREP III investors from conflicts of interest or the excessive valuations of properties transferred in a falling market.  The PPMs also omitted to adjust the prior results of LBREP I and II, two previous partnerships, to reflect the real estate decline and diminished Fair Value of properties, and thereby overstated them.  Some of the profits generated from prior sales in these Funds had actually been occasioned by Lehman repurchasing inappropriate properties it had originally sold to these Funds at a profit.

6.       In mid- to late-2007, as the sub-prime residential mortgage crisis spilled over onto the commercial real estate business, Lehman's Fuld, Gregory, Walsh and others made the conscious decision to "double down,"  increasing its exposure very substantially.  In doing so, Lehman repeatedly exceeded its own internal risk limits and controls.  In July, 2007, Lehman

ATL_IMANAGE-6887589.1

exceed its risk limit by $41 million, in August by $62 million, in September by $608 million, in October by $670 million, and so on.  (Examiner's Report, 4).  Defendants Callan and Fuld told the Examiner that, beginning in November 2007, Lehman determined to aggressively reduce its risk profile in commercial real estate.  (Examiner's Report, 158).

7.       It was at that same time, in October and November 2007, that most of the Plaintiffs received the PPMs and signed Subscription Agreements, thereby committing to invest their full Capital Commitment in the Partnerships.  On November 30, 2007, they were admitted as limited partners on November 30, 2007.  Some of the Plaintiffs signed Subscription Agreements in January and February of 2008 and were admitted shortly thereafter.  Actual payment of funds was to await their receipt of Capital Demand Notices to be sent by the General Partner.  No specific property investments were identified to the investors at that time, however, and would not be identified for another six months.  Plaintiffs' Capital Commitments were expressly made *irrevocable* by the Subscription Agreements, so investors were indeed wholly dependent on Defendants to abide by the PPM's promise to seek "risk-adjusted returns."  The first Capital Demand Notice of March 20, 2008 required deposits of capital by April 3, 2008, which all Plaintiffs timely made.  But no property investments followed anytime soon thereafter.  Lehman, meanwhile, kept its public statements positive – The "worst of the credit crisis is behind us," Defendant Fuld told the Lehman shareholders on April 15, 2008.

8.       Instead, a storm was brewing.  On May 21, 2008, financier David Einhorn gave a widely-reported speech that heavily criticized Lehman's failure to mark down to Fair Value its real estate portfolio as GAAP requires.  The Examiner's Report notes that Einhorn checked his write-down facts with Defendant Callan on the day before, May 20. (at 714).   Multiple attacks in the financial press quickly ensued, putting Lehman under intense pressure to write down real estate valuations.  Moreover, Lehman's common stock closing prices began to fall sharply.  Within six weeks, by June 30th, the stock would fall 50%.  Lehman's 2nd Quarter 2008 fiscal period was to end on May 31st, and further steep erosion in Lehman's stock price was expected,

due to the pressure to write down real property values before May 31st, with corresponding losses on its financial statements.  This all had major personal consequences for the Insider Defendants, most or all of whom had personal investment portfolios with large amounts of restricted Lehman stock with recent paper value in millions of dollars, but now dropping precipitously without the ability to sell due to the restrictions.  The overvalued real estate was now a javelin aimed at the financial statements, the Lehman stock price, and ultimately, right at the Insider Defendants' portfolios.  Of course, no loss would result for any property investments that Lehman might convey away to LBREP III before the May 31st close.

   9.      Thus, on May 28, 2008, three days before the end of Lehman's 2nd Quarter, Defendants caused 26 real estate investments, of which at least 20 were overvalued, to be transferred to Plaintiffs' Partnerships from Lehman Brothers itself or its affiliate, Defendant REPE.  The transfers were made in exchange for payment of investors' money at prices far above their then-current market value.  But the PPMs had disclosed no such risk of gross overpayment, nor any risk of Lehman's dumping its stale, overpriced investment properties acquired long before the PPMs to diminish the consequences of its unrealistic accounting.  Yet Insider Defendants knew of the lack of GAAP-compliant write-downs, the properties carried on the Lehman inventory list, the ongoing real estate market decline in 2007 and the first half of 2008, and the overstated valuations of the inventory properties.  The Examiner reported that Lehman wrote down its commercial real estate holdings by $488 million in the 1st and 2nd Quarters of 2008 (at 228).  But none of the properties transferred to LBREP III were written down by even a penny.  The properties were undoubtedly overvalued, as this anecdote shows: Three months later, Lehman attempted to sell its real estate assets that remained after transfers to the Partnerships.  But real estate experts from Citigroup, Credit Suisse, Deutsche Bank and Goldman Sachs who analyzed Lehman's real property portfolio for possible purchase found that it was overvalued by billions of dollars, with Lehman's $32.6 billion in commercial real estate holdings overvalued by as much as 35%.  (*Fortune,* December 15, 2008)("the assets should

probably have been $12 billion lower"). Thus, there was no private buyer willing to acquire such overvalued properties, and uniquely, even the Federal Reserve refused an interim loan to Lehman "because there was insufficient collateral."

10. For months after the May 28th property transfers to the Partnerships, the Insider Defendants delayed revealing that the transactions had occurred – even by withholding financial statements required by the LPAs – until after the last investor had paid in his capital in the final closing. Disclosure occurred only in September, after the Lehman bankruptcy. Upon their belated release, the financial statements, when compared with Supplemental PPMs, revealed that Defendants had spent Plaintiffs' funds to pay over $157 million dollars more overall than Lehman had reportedly paid for the properties. The actual excess payment over property value acquired would substantially exceed $157 million, since the Fair Value of the properties transferred was substantially less than the valuations at which Lehman carried them. Moreover, not only did the Partnerships' prices exceed the prices that Lehman had stated it had paid for the properties months before, they also exceeded the permissible limits for transfer pricing stated in the LPAs. As a result of the transfers, Plaintiffs' investments dropped 30% in value due to the valuations that did not comply with GAAP. Such a loss was a consequence of the foreseeable risk of Defendants' failure to disclose the plan to transfer existing overvalued Lehman inventory to the Partnerships instead of "new opportunities" as represented in the PPM. Each Defendant knew of such risk of loss to Plaintiffs in describing future property acquisitions by omitting to state the plan to transfer existing Lehman inventory instead of new investments. Insider Defendants each had access to the confidential Lehman property inventory records at the time of writing the PPMs and knew the specific properties that Lehman had already acquired for transfer to LBREP III. Thus, Defendants engaged in dozens of improper transactions while concealing material information both in the PPM and during their scheme's enactment.

11. Plaintiffs would not have invested in the Partnerships had they known the material facts omitted from the PPMs, and Plaintiffs have suffered harm as a foreseeable consequence of

Defendants' omissions which disguised the very risks to which Plaintiffs fell victim, including without limitation the omissions: (i) that Lehman's "rigorous approval process" for real estate investments would not benefit Plaintiffs because most Partnership investments had already been acquired by Lehman at much higher prices than those prevailing when Plaintiffs invested; (ii) that Defendants could transfer Lehman's legacy "warehoused" real estate investments in self-dealing transactions without adequate disclosure or investors' consent as required by the Investment Advisor Act of 1940; (iii) that real estate investments that Defendants planned to transfer to the Partnerships included at least 20 depressed properties that represented substantial losses that new investors would have to absorb entirely; (iv) that Lehman's precarious but undisclosed true financial situation would prevent Lehman from marking the valuations of its real estate investments down to Fair Value as required by GAAP, since even a small reduction would have revealed Lehman's virtual insolvency; (v) that, moreover, writedowns or Lehman's conflicts of interest would not be considered for fairness to investors due to Defendants' blatant refusal to form an Investor Advisory Committee as required.

## THE PARTIES

12.   Plaintiffs Barbara J. Fried and B. Mark Fried are residents of Virginia and limited partners of Partners III, with initial capital committed of $5 million. Plaintiff Altitude Partners, LLC is organized in Delaware and a limited partner of Partners III with initial capital committed of $5 million. Plaintiff Richard D. Maltzman of California and is trustee for the Richard D. & Charlene Maltzman Family Trust U/A/D, 3/23/88, a limited partner of Fund III with initial capital committed of $500,000. Plaintiff Zelfam, LLC is organized in Ohio with initial capital committed of $500,000. Plaintiff Jefforeed Partners, L.P. is organized in California, and made in initial capital commitment of $500,000. Its general partner is Jefforeed Management Co., Inc., of which plaintiff Richard D. Maltzman is president.

13.   Plaintiff Alan Gerber Lewis Marital Irrevocable Trust, Bannockburn, IL is a limited partner of initial commitment of $500,000; Plaintiff Alex Khowaylo, Upper Saddle

River, NJ, is a limited partner of initial commitment of $500,000; Plaintiff  Barry J. Aronoff

Revocable Trust, Costa Mesa, CA, is a limited partner of initial commitment of $500,000;

Plaintiff The Revocable Trust of William R. Newlin, Sewickley, PA, is a limited partner of

initial commitment of $1,100,000; Plaintiff William J. Schmuhl, Jr. Trust, South Bend, Indiana,

is a limited partner of initial commitment of $500,000; Plaintiff Bukfenc LLC, Atlantic Beach,

NY, is a limited partner of initial commitment of $500,000; Plaintiffs David Eugene Catlin and

Linda Diane Catlin, TTEE, Plaintiff Catlin Family Trust DTD 6/4/92, Westlake Village, CA, is a

limited partner of initial commitment of $1,000,000; Plaintiff Charco Ventures LP, Atherton,

CA, is a limited partner of initial commitment of $2,000,000;  Plaintiffs Daniel and Elizabeth

Pfau,  Chestnut Hill, MA, are limited partners of initial commitment of $500,000; Plaintiff

Dektor Family Trust, Studio City, CA, is a limited partner of initial commitment of $1,000,000;

Plaintiff Donald E. Lefton Revocable Trust DTD 4/18/00, Amended 6/23/06,  Miami, FL, is a

limited partner of initial commitment of $2,000,000; Plaintiff Drew D. Perkins Trust 1999 u/d/t

dated December 21,, 1999, Saratoga, CA, is a limited partner of initial commitment of

$1,250,000; Plaintiff Eli Barkat Holdings Ltd., Ben Gurion Airport, Israel, is a limited partner of

initial commitment of $500,000; Plaintiff Erik Sculte, Milford, CT, is a limited partner of initial

commitment of $25,000, Plaintiff Frank Keener, Nashville, TN, is a limited partner of initial

commitment of $500,000; Plaintiff Frank Rutan, Ambler, PA, is a limited partner of initial

commitment of $50,000; Plaintiff George J. Evans, New York, NY, is a limited partner of initial

commitment of $500,000; Plaintiff GSB Holdings Inc., 12012 Wellington, FL, is a limited

partner of initial commitment of $2,000,000; Plaintiff Iracini LP, Rancho Santa Fe, CA, is a

limited partner of initial commitment of $2,500,000; Plaintiffs James J. and Susan Van Stone,

Nichols Hills, OK, are limited partners of initial commitment of $150,000; Plaintiffs James R.

and Margaret W. Douglass, Pittsburgh, PA, are limited partners of initial commitment of

$500,000; Plaintiff Jeffrey R Moster, Chicago, IL is a limited partner of initial commitment of

$25,000; Plaintiff Jeffrey Hecktman Trust u/a dtd 3/28/84, Highland Park, IL, is a limited partner

of initial commitment of $500,000; Plaintiffs John M. Argue and Julie C. Argue Trustees, Argue

Family, Trust 11/8/00, Los Angeles, CA, are limited partners of initial commitment of $500,000;

Plaintiffs John Draghi and Kathleen Draghi TTEES for John Draghi, Trust UAD 06/27/2007,

New York, NY, is a limited partner of initial commitment of $500,000; John S. Rosekrans, Mill

Valley, CA, is a limited partner of initial commitment of $500,000; Plaintiff Karen A. Ubelhart,

New York, NY, is a limited partner of initial commitment of $75,000; Plaintiff Louise E. Cohen,

Great Neck, NY, is a limited partner of initial commitment of $500,000; Plaintiff Martin S.

Burger,  West Harrison, NY, is a limited partner of initial commitment of $500,000; Plaintiff

Branon Rev. Trust dtd 9/1/99, Carlsbad, CA, is a limited partner of initial commitment of

$500,000; Plaintiffs Michael Sher and Billie Gelb, Sherman Oaks, CA, are limited partners of

initial commitment of $500,000; Plaintiff Nir Barkat Holdings Ltd., Ben Gurion Airport 70100,

Israel, is a limited partner of initial commitment of $500,000; Plaintiff Paul Dektor, Los Angeles,

CA, is a limited partner of initial commitment of $500,000; Plaintiff Peach Blow Partners, LP,

Atlanta, GA, is a limited partner of initial commitment of $2,000,000; Plaintiff Provident

Holdings, Inc., Ste. 102, Guilford, CT, is a limited partner of initial commitment of $1,500,000;

Plaintiffs Philip S Dauber & Elayne R Dauber TTEES PSERD Trust dtd 03/11/1986,  Los Altos

Hills, CA, 750,000; Plaintiff RFLP Group LLLP, Tampa, FL, are limited partners of initial

commitment of $1,000,000; Plaintiffs Richard & Rickel Shuster, Wellesley, MA, are limited

partners of initial commitment of $500,000; Plaintiff Richard Alan Landgarten, Scarsdale, NY, is

a limited partner of initial commitment of $750,000; Plaintiff Robert T. Fraley Trust, St. Louis,

MO, is a limited partner of initial commitment of $500,000; Plaintiff Ross C. Hartley, Teton

Village,WY, is a limited partner of initial commitment of $500,000; Plaintiffs Russell and Judith

Fradin, Winnetka, IL, are limited partners of initial commitment of $800,000; Plaintiff Sanford

H. Robbins, Manhasset, NY, is a limited partner of initial commitment of $1,000,000; Plaintiffs

Shlomo Shmelzer & Atalya Shmelzer, Petach Tikva, Israel, are limited partners of initial

commitment of $500,000; Plaintiff Simon Family Investment Partnership, Lisle, IL, is a limited

partner of initial commitment of $500,000; Plaintiff Wally Findlay Galleries, New York, NY 10022, is a limited partner of initial commitment of $25,000; Plaintiffs Stephen and Kathleen Guarino, Melford, NJ, are limited partners of initial commitment of $1,000,000; Plaintiff Steven G. Holder Trustee, Steven G. Holder Living Trust, Irvine, CA, is a limited partner of initial commitment of $2,000,000; Plaintiff Lowrey Family Trust, Pasadena, CA, is a limited partner of initial commitment of $500,000; Plaintiff Gold/Sherman-Gold Family Trust DTD 4/14/2000, Palo Alto, CA, is a limited partner of initial commitment of $500,000; Plaintiff Thomas G. Macey, , Chicago IL, is a limited partner of initial commitment of $750,000; Plaintiff Three Horse Investments, Bristol, VA, is a limited partner of initial commitment of $500,000; Plaintiff Vahid Manian, Trabuco Canyon, CA, is a limited partner of initial commitment of $500,000; Plaintiff Waite Family Trust, Saratoga, CA, is a limited partner of initial commitment of $1,000,000; Plaintiff William C. Scott, New York, NY, is a limited partner of initial commitment of $500,000; Plaintiff Yuval 63 Holdings (1995) Ltd., Ben Gurion Airport 70100, Israel, is a limited partner of initial commitment of $500,000.

14.     Plaintiffs have appointed an *ad hoc* committee (the "Ad Hoc Committee") consisting of the first four named Plaintiffs on this Second Amended Complaint, to represent the interests of the remaining Plaintiffs for purposes of investigating and seeking remedies for any misconduct by the General Partner with respect to the Partnerships , each formed on June 25, 2007 by Lehman Brothers Holdings, Inc. ("Lehman" or "Lehman Brothers"), of which General Partner is the general partner.  The group of 11 limited partnerships formed by Lehman of which the General Partner is general partner is referred to as "LBREP III."  Lehman Brothers is in bankruptcy proceedings and is not a party hereto.

## Role of General Partner, Investment Advisor and REPE

15.     Upon information and belief, Defendants General Partner and Investment Advisor are wholly-owned affiliates of Lehman.  General Partner is a Delaware limited partnership and the general partner of the Partnerships and the seven other limited partnerships within LBREP

III, either directly or through an organization composed of the same personnel as the General Partner.  The Investment Advisor is a Delaware limited liability company registered under the Investment Advisers Act of 1940.  The Investment Advisor acted as the investment advisor to LBREP III, and received a portion of the management fees paid by LBREP III.  REPE is a Delaware corporation formed by Lehman Brothers on January 31, 2005, and an affiliate of the General Partner and Investment Advisor that, upon information and belief, acquired and "warehoused" real estate investments for the purpose to later transfer them to the Partnerships as part of Defendants' plan alleged herein.  REPE and the Investment Advisor were involved in sourcing and analyzing the Subject Investments, structuring and negotiating those transactions, and recommending the timing and manner in which Subject Investments were acquired and "warehoused" both before the Partnerships were formed on June 25, 2007 and thereafter. Neither the General Partner, the Investment Advisor nor REPE is subject to the bankruptcy proceedings presently involving Lehman Brothers, but each of them employed, and were controlled and operated by, the Insider Defendants and thus participated in the omissions and misrepresentations with intent to deceive alleged here in connection with the PPMs' offering and sale of interests to Plaintiffs.

16.     LegacyCo Advisors and ManageCo are newly-formed entities owned by certain defendants which are described in paragraph 20 below.

### Role of Mark A. Walsh

17.     Defendant Mark A. Walsh ("Walsh") was a Managing Director of Lehman Brothers and Head of Lehman Brothers' Global Real Estate Group since 2004.  According to the PPMs, Mr. Walsh was responsible for overseeing all of Lehman's real estate debt and equity transactions.  Mr. Walsh was a member of Lehman's Management Committee and had primary responsibility for Lehman's real estate portfolio.  On information and belief, based on (i) his executive position in Lehman's real estate division, and on (ii) Lehman's practice of granting restricted stock to high executives, Mr. Walsh was generously compensated, including with

ATL_IMANAGE-6887589.1

Lehman restricted stock.

## Role of Brett Bossung

18.     Defendant Brett Bossung ("Bossung") was Managing Director of Lehman Brothers and Global Co-Head of Real Estate Private Equity, and Managing Director of the General Partner. Mr. Bossung also acted as Principal and Managing Director of limited partnerships within LBREP III.  On information and belief, based on (i) his executive position in Lehman's real estate division, and on (ii) Lehman's practice of granting restricted stock to high executives, Mr. Bossung was generously compensated, including with Lehman restricted stock.

## Role of Mark H. Newman

19.     Defendant Mark H. Newman ("Newman") was also a Managing Director of Lehman Brothers and Global Co-Head of Real Estate Private Equity.  Mr. Newman was a Managing Director of the General Partner, and chaired the Screening Committee for the LBREP Funds, which reviewed all potential investments.  Mr. Newman also acted as Principal and Managing Director of limited partnerships within LBREP III.  Mr. Newman was also on the Investment Committee, as were Messrs. Walsh and Bossung.  On information and belief, based on (i) his high executive position in Lehman's real estate division, and on (ii) Lehman's practice of granting restricted stock to high executives, Mr. Newman was generously compensated, including with Lehman restricted stock.

## Additional Allegations on Walsh, Bossung, Newman, LegacyCo and ManageCo

20.     On information and belief, due to their high executive positions in Lehman's real estate division, Messrs. Walsh, Bossung and Newman each:  (i) had knowledge of and access to Lehman's then-current and confidential Portfolio Records including dates of acquisition, carrying value and also actual market valuations, (ii) personally participated in the outlining, writing, reviewing, revising, and/or overseeing of the PPMs and had substantial responsibility for their contents, including the omissions made therein, the true facts of which, due to their access to such information, were known to Walsh, Bossung and Newman to be necessary to avoid

misleading investors when the PPMs were issued.  Messrs. Walsh, Bossung and Newman (iii) could and should have corrected such misleading statements, but each and all of them had motivation to maintain the value of his personal Lehman stock and the valuations of Lehman's property inventories and of interests in its real estate limited partnerships, and (iv) sold substantial amounts of their Lehman stock that had come free of restrictions during the time that the PPMs were circulated to investors and thereafter, before and after the May 28, 2008 transfers of properties to the Partnerships, all until December 5, 2008 while they wrongly declined to furnish financial statements to Plaintiffs that would have disclosed the transfers of overvalued Lehman inventory to the Partnerships, based on the numerous sales of Lehman stock during that period by other highly-placed Lehman executives who, unlike Walsh, Bossung or Newman, had to report such sales on SEC Form 4.

### The "Consent" Election for Transfer from Lehman and Additional Fees

21.     In connection with a sale and acquisition transaction consummated after March 23, 2010, Defendant LegacyCo Advisors and Defendant ManageCo were formed by Defendants Walsh, Bossung and Newman to enable them to acquire the business of the Lehman GP and to continue to manage the assets and collect the original LPA management fees of the Partnerships. A substantial majority of ManageCo is owned by Defendants Walsh, Bossung and Newman, and ManageCo, in turn, owns 100% of LegacyCo.  The LPAs provided that any such transfer of the business of the Lehman GP required the affirmative consent of the Fund Partners, so limited partners were alerted on June 15, 2009 to expect consent forms for that purpose in short order.  A "Consent Package" finally was sent to limited partners in February 2010, not only soliciting consent to the transfer transaction, but also to a proposal for substantial additional fees, on top of LPA Management Fees, of up to $49,000,000 for Defendants Walsh, Bossung, Newman and their assistants!  In the sale and acquisition transaction, substantially all of the rights and obligations of the Lehman GP are believed to have been acquired by LegacyCo, based on information circulated in the solicitation of consent to the proposals. LegacyCo and ManageCo

were described in the consent solicitation, and they are named as defendants herein due to their liability as successors.

22.     Defendants Walsh, Bossung, Newman, LegacyCo and ManageCo claimed on March 23, 2010 to have received the consent of over 90% in interest of the limited partners of LBREP III to the acquisition and additional fee proposal, but to date they have failed and refused to disclose what portion of the claimed 90% affirmative vote was due to LPA ¶11.3 provision that failure of a limited partner to respond within 10 days after notification would be "deemed a consent" to the proposal.  Indeed, any active response, pro or con, was made difficult, as the forms for partners' active consent were buried within a 155-page email attachment!  Partners were required to exert much effort to simply obtain a copy of the consent form and return it, because, as Defendants' counsel William Burck made clear, Defendants would disqualify any consent form sent by *return email*, and count it as an affirmative vote by default.  Nonetheless, in a filing with this Court on April 1, 2010, Defendants' counsel Jonathan D. Polkes represented the claimed 90% vote as a "referendum on investor confidence in Fund management" which showed Plaintiffs' "lack of support from other investors."  Mr. Polkes' optimism about "investor confidence in Fund management" coincided with those investors holding' 50% losses in value of their investments, of which three-fifths occurred on Day One, May 28, 2008.

### Role of Christopher M. O'Meara

23.     Defendant Christopher M. O'Meara ("O'Meara") was the Chief Financial Officer, Controller and Executive Vice President of Lehman Brothers from 2004 until December 1, 2007, when he was named Global Head of Risk Management of Lehman Brothers.  As head of Risk Management, Mr. O'Meara was responsible for supervising Lehman's risk mitigation strategies and procedures.  On information and belief, Mr. O'Meara was generously compensated with restricted stock from at least 2004, based on Lehman's compensation policy with other high executives.  For fiscal year 2007, O'Meara received an annual salary of $200,000, a cash bonus of $2,650,000 and a restricted stock award of $6,642,857, for total

compensation of $9,492,857.

## Role of Richard S. Fuld, Jr.

24.     Defendant Richard S. Fuld, Jr. ("Fuld") joined Lehman full time in 1968 at the age of 23.  He became Chief Executive Officer of Lehman Brothers in November 1993 and Chairman of the Board of Directors in April 1994 and remained in those capacities until 2009. Mr. Fuld was the ultimate architect of Lehman's business strategy to acquire real estate investments at exorbitant prices with borrowed funds, eventually reaching a reported 44-times debt-to-equity ratio, and the plan to transfer overpriced real estate investments to LBREP III and thereby pass the losses onto investors..  On information and belief, based on (i) his high executive position in Lehman, and on (ii) Lehman's practice of granting restricted stock to high executives, Mr. Fuld was generously compensated, including with Lehman restricted stock. Between 2000 and September 2008, Fuld received nearly $500 million in cash and restricted stock compensation from Lehman Brothers.  On September 15, 2008, Mr. Fuld sold 2,878,302 Lehman shares in the morning, and later that day put Lehman into bankruptcy.

## Role of Joseph M. Gregory

25.     Defendant Joseph M. Gregory ("Gregory") served as Lehman's President and Chief Operating Officer from May 2004 until he resigned in June 2008.  During his tenure, Gregory oversaw and was responsible for the day-to-day management of Lehman Brothers' operations, while Fuld handled the external duties.  Mr. Gregory participated in the scheme to transfer overpriced real estate investments to LBREP III and thereby pass the losses onto investors.  On information and belief, based on (i) his high executive position in Lehman, and on (ii) Lehman's practice of granting restricted stock to high executives, Mr. Gregory was generously compensated, including with Lehman restricted stock.  For fiscal 2007, Gregory received salary of $450,000, a cash bonus of $4.5 million, and a massive restricted stock award of $29 million, totaling $34 million for the year 2007.

ATL_IMANAGE-6887589.1

### Role of Erin Callan

26.     Defendant Erin Callan ("Callan") joined Lehman Brothers in 1995, became the Company's CFO and Global Controller from December 1, 2007 until June 2008 when she resigned.  Ms. Callan was CFO on May 28, 2008 and participated in the scheme to transfer overpriced property investments that day to LBREP III, along with Lehman's losses.  On information and belief, based on (i) her high executive position in Lehman. and on (ii) Lehman's practice of granting restricted stock to high executives, Ms Callan was generously compensated, including with millions of dollars of Lehman restricted stock.  Defendant Callan is now head of Credit Suisse's global hedge fund business.

### Role of Ian Lowitt

27.     Defendant Ian Lowitt ("Lowitt") replaced Callan as CFO on June 12, 2008 and also served as Co-Chief Administrative Officer since 2006, with oversight on Lehman's finance organization, and global risk management, and served on the Executive Committee during all times herein.  Mr. Lowitt participated in Lehman's decisions not to write down the property valuations adequately, and also in the decision not to send LBREP III financial statements for the 2nd Quarter 2008 to conceal the May 28th transfers temporarily, as alleged herein.  On that day, May 28, 2008, Mr. Lowitt beneficially owned 214,651 shares of Lehman stock**.**  On information and belief, based on (i) his high executive position in Lehman, and on (ii) Lehman's practice of granting restricted stock to executives, Mr. Lowitt was generously compensated, including with Lehman restricted stock.  For fiscal 2007, Lowitt received annual salary of $200,000, cash bonus of $2.65 million and restricted stock of $6.64 million, for total compensation of $9.49 million.

### Role of Michael J. Odrich

28.     Defendant Michael J. Odrich ("Odrich") was the Head of Private Equity for Lehman Brothers, and was a member of Lehman's Investment Committee that determined what real estate investments Lehman Brothers would acquire.  Mr. Odrich was a participant in the scheme to conceal the Lehman overvaluation of real property from LBREP partners, and then to

ATL_IMANAGE-6887589.1

transfer overvalued property to the Partnerships.  On information and belief, based on (i) his

executive position in Lehman, and (ii) Lehman's practice of granting restricted stock to

executives, Mr. Odrich was generously compensated, including with Lehman restricted stock.

### Role of Thomas Russo

29.     Defendant Thomas Russo ("Russo") was Chief Legal Officer of Lehman Brothers

since 1993 and was an Executive Vice President of the Company and a member of, and counsel

to, the Executive Committee.  With the Lehman organization, he had the legal responsibility to

publish PPMs and LPAs without misrepresentations and omissions of the type alleged herein,

and to oversee legal counsel to ascertain that they did not include such matters in the final draft

PPMs.  On information and belief, based on (i) his executive position in Lehman's real estate

division, and on (ii) Lehman's practice of granting restricted stock to high executives, Mr. Russo

was generously compensated, including with millions of dollars of Lehman restricted stock.  For

the fiscal year 2007, Russo received a salary of $450,000, a cash bonus of $4,550,000 and

restricted stock of $9 million, for total compensation of $14 million.

### Further Joint Allegations on Lehman Insider Defendants

30.     Defendants Walsh, Newman, Bossung, Odrich, O'Meara, Fuld, Gregory, Callan

Russo and Lowitt are sometimes herein referred to as the "Insider Defendants."  On information

and belief, due to their high executive positions in Lehman, Messrs. Odrich, O'Meara, Fuld,

Gregory, Russo, Lowitt and Ms. Callan each:  (i) had knowledge of Lehman's then-current and

confidential Portfolio Records including dates of acquisition, carrying value and also actual

market valuations, (ii) personally participated in the outlining, writing, reviewing, revising,

and/or overseeing of the PPMs and had substantial responsibility for their contents, including the

misrepresentations and omissions alleged or made therein, which, due to their access to such

information, were known to Messrs. Odrich, O'Meara, Fuld, Gregory, Russo, Lowitt and Ms.

Callan to be false or misleadingly incomplete at the time the PPMs were issued.  Messrs. Odrich,

O'Meara, Fuld, Gregory, Russo, Lowitt and Ms. Callan (iii)  could and should have corrected

such false or misleading statements, but each and all of them had motivation to maintain the value of his personal Lehman stock and the valuations of Lehman's property inventories and of interests in its real estate limited partnerships, and (iv) sold substantial amounts of their Lehman stock that had come free of restrictions during the time that the PPMs were circulated to investors and thereafter, before and after the May 28, 2008 transfers of properties to the Partnerships, all until December 5, 2008 while they wrongly declined to furnish financial statements to Plaintiffs that would have disclosed the transfers of overvalued Lehman inventory to the Partnerships, based on the numerous sales of Lehman stock during that period, based on sales reported on SEC Form 4.

31.     Upon information and belief, in 2009, Defendants Walsh, Bossung and Newman agreed to purchase the Lehman Brothers Real Estate Private Equity business and to continue to jointly own and manage such business in a new entity which is sued as Defendant Doe 1 herein.

32.     The Insider Defendants served as senior officers of Lehman Brothers, the General Partner and/or principals of LBREP III during the relevant time period and, because of their positions, were able to control the content of representations or the omissions of material fact made to Plaintiffs and other investors in PPMs, Supplements and LPAs, and each had access to undisclosed information regarding the Partnerships' investments, and the authority to prevent or correct disseminations of information to Plaintiffs.  Furthermore, the Insider Defendants had an affirmative duty to promptly disseminate accurate and truthful information and/or correct any misleading omissions of fact regarding the financial condition, performance, operations, financial statements, and investments of the Partnerships.  Despite this affirmative duty, the Insider Defendants each knowingly and intentionally made, or participated in making or reviewing misleading statements and omissions of material fact in order to allow the General Partner to carry out real property transactions not in the best interest of the Partnerships, in a desperate effort to generate liquidity for Lehman Brothers in the midst of its financial crisis.

33.     On information and belief, based on their high executive positions within

---

Lehman, their responsibilities for the business of the Lehman real estate business, and/or their fiduciary obligations to Lehman as executives, Defendants Walsh, Bossung, Newman, Fuld, Gregory, Odrich, O'Meara, Callan, Russo, and Lowitt were each involved in drafting or reviewing and approving the separate sales materials, the PPMs, the PPM Supplements and the Limited Partnership Agreements, and in devising and implementing the scheme by which material misrepresentations or omissions would be utilized to attract Plaintiffs' and other investors' investments, the funds of which would be used by the General Partner to purchase Lehman Brothers' and REPE's over-valued real estate investments at inflated prices without adequate disclosure of the losses to be incurred by the Partnerships or any informed consent, and without disclosing the plan not to form an IAC until the property transfers had been made and it was too late to look out for Plaintiffs' and other investors' interests.  Furthermore, on information and belief, based on supporting statements in the PPMs and LPAs, Messrs. Walsh, Bossung, Odrich, Russo and Newman were all part of the LBREP III Investment Committee, which reviewed and gave final approval to acquire the LBREP III investments, and Defendants O'Meara, Fuld, Gregory, Callan and Littow were all Lehman Brothers officials instrumental in the property transfers to LBREP III.  As such, all Defendants were involved in devising the scheme and reviewing and approving the transfers of the Subject Investments to the Partnerships.

34.    The General Partner and affiliates, the Insider Defendants are each liable for any material false statements or omissions pleaded herein, as the statements are each "group-published" information for which they are collectively responsible.

35.    Plaintiffs are ignorant of the true names and capacities of Defendants named herein as Does 1 through 50 and therefore sue these Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each of the Defendants designated herein as a Doe is responsible in some manner for the fraud and deception, breaches, acts, omissions, and/or events alleged herein, and actually and proximately caused injuries and damages to Plaintiffs as alleged herein.  Plaintiffs will seek leave to amend this Complaint to

allege their true names and capacities when ascertained.

36.     Plaintiffs are informed and believe, and thereon allege that, at all relevant times, each Defendant was the principal, agent, employee, partner, associate, joint venturer, successor-in-interest, co-conspirator and/or acting in concert with, and under the direction and control of, each remaining Defendant, and in doing the things alleged in this complaint, each Defendant was acting within the course and scope of these relationships.

37.     Plaintiffs are informed and believe, and thereon allege, that, at all relevant times, each Defendant conspired with each remaining Defendant, and acted in accordance with the scheme devised and enacted jointly by each such Defendant.  Among the co-conspirators are persons other than the named Defendants who are unknown to Plaintiffs, who participated in, assisted, and advised the drafting of the PPMs and the Supplements, as well as LPAs and all other documents relating to the Partnerships issued by the Defendants to the Plaintiffs as alleged herein.  Said unnamed co-conspirators played such a substantial role in the creation of the statements contained in the PPMs, the Supplements thereto, and other documents, that it fairly co-authored the fraudulent misrepresentations and omissions alleged herein.

38.     Defendants are not protected by any statutory safe harbor for forward-looking statements because that protection does not extend to the false statements and omissions alleged in this complaint. First, many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  Second, to the extent there were any forward-looking statements, Defendants did not provide meaningful cautionary statements identifying the conduct alleged herein as important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Defendants are liable for those false forward-looking statements because they knew, when such statements were made, authorized and/or approved by executive officers of the General Partner that those statements were false.  Finally, many of the statements pleaded in this complaint do not constitute "forward-looking" statements regarding performance of the Partnerships, but instead are statements of fact regarding the

Partnerships' purported objectives, management standards, and investment strategies and criteria.

## JURISDICTION AND VENUE

39.     This court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act (15 U.S.C. § 78(a) *et seq.*) and 28 U.S.C. § 1331.  The claims asserted herein arise under Section 10(b) of the Securities Exchange Act, as amended, 15 U.S.C. § 78(b) and § 78t(b), and Rule 10b-5 thereunder.

40.     Venue lies in this Court pursuant to Section 27 of the Securities Exchange Act and is proper pursuant to 28 U.S.C. § 1391 because, among other things, a substantial part of the events or omissions giving rise to the claim occurred in this district.  In addition, the Limited Partnership Agreements governing the Partnerships provide, at Section 11.16, for jurisdiction and venue in this forum.

41.     The Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce including the wires and the mail, or the facilities of a national securities exchange in connection with the transactions and courses of business alleged herein.

## STATEMENT OF FACTS

42.     On or about June 25, 2007, Defendants formed the Partnerships.  Between that date and August 29, 2008 when the final Closing took place, the Defendants formed other LBREP III limited partnerships managed by the General Partner (collectively, the "Parallel Funds," when referring to LBREP III partnerships *other than* the four "Partnerships").  As noted, there are eleven LBREP III partnerships into which investors' funds would be funneled for later use to buy real estate investments, of which the Partnerships (Fund III and Partners III) in which Plaintiffs invested are four components.

43.     The Partnerships and the Parallel Funds (which together comprise LBREP III) were managed by a common general partner, the General Partner.  Defendant Investment Advisor acted as investment advisor to LBREP III pursuant to an investment advisory agreement, compensated by a portion of management fees paid by the the limited partners of the

ATL_IMANAGE-6887589.1

Partnerships and the Parallel Funds.  Defendants intended that all LBREP III Partnerships invest in substantially the same real estate properties, generally pro-rata based on the relative amounts of their contributed capital.

44.    Defendants began accumulating real estate investments that they intended to transfer to LBREP III well before any LBREP III limited partnerships were formed, or before any PPMs were written by Defendants or Subscription Agreements signed by investors.  These property investments (the "Warehoused Properties") included properties at 200 Fifth Avenue, New York, N.Y. ("Toy Building"); Eighth Avenue and 44th Street, New York ("Project West 44th Street"); Continuing Care Retirement Communities at FM-620 and Schlumberger Drive, Austin, Texas and 40 acres in southeastern Louisville, KY ("Aldi Development Properties"), Sheraton Bellevue Hotel, Bellevue, WA ("Bellevue"); Boston Garage Portfolio, Boston, MA "Boston Garage"); St. Joe Office Portfolio, various US cities ("St. Joe"); 1001 McKinney, Houston TX (McKinney"); UK Residential Portfolio, London, U.K. ("UK Residential"); Atemi Stake, France ("Atemi"); Chancerygate Industrial properties, various U.K. locations ("Chancerygate"); Latvia Residential Portfolio, Riga and Jurmala, Latvia ("Latvia"); Timisoara Residential properties, Timisoara, Romania ("Timisoara"); Bogtodorska Residential, Wroclaw, Poland ("Bogtodorska"); Ridge at Crescent Cove, Atlanta, GA ("Ridge"); Clemenceau office building, Singapore ("Clemenceau"); ALAM stake, China ("ALAM"); Rightway stake, Dalian, China ("Rightway"); Bangkok Serviced Apartments Portfolio, Thailand ("Bangkok"), and others.  The Warehoused Properties were purchased by Lehman Brothers for its own account, for future assignment to investors' limited partnerships.  Many were purchased near the top of the market not long before the commercial real estate market began a steep decline.  Each of these properties was omitted from the PPMs, however, and the omission continued until after Plaintiffs were required to commit to invest with Lehman.  Plaintiffs are informed and believe, based on the May 3, 2009 *New York Times* article entitled "How Lehman Brothers Got Its Real Estate Fix," that many, if not all, of the Warehoused Properties were investments for which Lehman

earned substantial fees for providing financing for the ventures and/or securing equity financing.

45.     In October and November 2007, most of the Plaintiffs signed Subscription Agreements, committing collectively to contribute capital of over $53 million, plus pay management fees of between 1% and 1.75% per annum depending on which partnership they invested in, and were admitted as limited partners of their respective partnerships.  On March 20, 2008, the General Partner made its first Capital Call, and Plaintiffs, along with most other LBREP III Partners, contributed initial capital totaling about $640 million prior to April 2, 2008. Plaintiffs made their investments in reliance on the PPMs, the LPAs and other materials published by Defendants.

**Misrepresentations in the Private Placement Memoranda ("PPM").**

46.     Defendants sold the limited partnership interests to Plaintiffs by use of PPMs and LPAs that were virtually identical for each Partnership, and a Confidential Presentation dated October 2007.  As noted, a PPM is attached as **Annex A,** and an LPA is attached as **Annex B.** Defendants stated the investment strategy in the PPMs, aiming to create the impression that investment decisions would serve investor Limited Partners' best interests, and would capitalize on real estate trends to "maximize returns" on limited partners' investments.  (PPM at Section III, p.18).  The PPMs described the investment selection as occurring in the future, when LBREP III could profit from current market conditions:  "LBREP III is well positioned to capitalize on the continuing market opportunity as well as to anticipate and evaluate new opportunities." (PPM at Section I, p.7).  *But the PPMs were misleading becaus*e they implied that Partnership funds would be invested as new opportunities arose in the future, and omitted to state the actual fact, as Defendants knew based on their personal activities and access to Portfolio Reports, that most of the property investments intended for the Partnerships had already been acquired by Lehman months before, near the top of the market, and that subsequent losses from the properties' devaluation would fall entirely to new investors. Contrary to the representations made to Plaintiffs, the acquisitions would not be first approved by an independent Investor Advisory

ATL_IMANAGE-6887589.1

Committee.  As Defendants knew, the declining real estate market and Lehman's rapid accumulation of property investments made it foreseeable that omitting from the PPM any warning of the risk that Defendants intended to transfer Lehman's previously-warehoused investments at prices substantially higher than the then-prevailing Fair Value would proximately result in investors' having to absorb losses in the hundreds of millions of dollars.  Those losses were foreseeable to Defendants as they were experts in global real estate and knew that the global real estate market was in drastic decline in the ongoing recession.  These losses were also within the zone of risk posed by Defendants' concealment, and the losses indeed materialized to Plaintiffs' damage.

47.     Defendants' PPMs also misled prospective investors by omitting to correct statements like "LBREP III will look to *maximize returns for its investors* by," among other strategies, "executing fundamental and *value-driven investment*, asset management and exit strategies."  (PPM at Section IX, p.54). (Emph. added).  *This was misleading because* it suggested that Defendants would seek to "maximize returns" for <u>*those new investors*</u> whose investments were sought and to whom the PPMs were addressed, because, in the declining market, that could only be done by acquiring <u>*new properties.*</u>  Defendants each knew that this was false and misleading, and knew the actual plan, omitted from the PPMs, was to invest new funds in purchase of Lehman's "warehoused" properties brought near the top of the market and cause the new investors to absorb the entire loss from Lehman's books.  Defendants knew that, by the omissions, the PPMs concealed their plan to transfer to investors the accumulated losses inherent in Lehman's prior property investments, which made it foreseeable that the concealed risk of substantial losses to investors would proximately result from investments in response to the PPMs, as did indeed occur.

48.     The omissions to state Defendants' plan to transfer to LBREP III Lehman's legacy properties and accumulated losses belied and lent false credence to the PPM statements that "the General Partner will access and continuously screen Lehman's proprietary deal flow for

opportunistic investments that capitalize on proven trends in the real estate sector, or for situations that possess unique non-traditional characteristics or complexities that create significant asset value." (PPM at Section III, p.20). *This was misleading because* it speaks in the future of a "continuous screening" process to look for "opportunistic investments," while concealing, as Defendants knew from their positions at Lehman and access to Portfolio Records, the actual fact that most of the investments Defendants intended for new investors were the "warehoused" investments Lehman had purchased long before, near the market's top, and that investors such as Plaintiffs would suffer the entire loss from the properties' diminished value.

49.     The "Investment Process" section of the PPMs purported to depict Defendants' diligent investment analysis procedures, including review by a succession of internal committees: "[p]rior to any formal agreement to participate in an investment, the proposed investment must be reviewed and approved by both LBREP III's Screening Committee and Lehman Brothers' Private Equity Investment Committee," and thereafter by the Investment Committee in final review. (PPM at Section V, p. 26). *This was misleading due to* the omission to state Defendants' plan to transfer legacy Lehman properties to the LBREP III partnerships along with Lehman's accumulated losses.

50.     Moreover, the PPMs omitted material facts in describing a proposed Investor Advisory Committee ("IAC") that Defendants would create for the benefit of the limited partners to create checks and balances on the General Partner's power. The PPMs and LPAs Section 6.8(a) stated that this independent IAC would be comprised of representatives of investors who were unaffiliated with the General Partner and "who, as a group, were representative of the Limited Partners." (PPM at Section V, p. 27; LPA Section 6.8(c)). The PPMs' stated purpose for the IAC was "to advise the General Partner with respect to potential conflicts of interest, to consult on the General Partner's valuations for the purposes of determining write-downs of investments, if any, [and] to provide consents as may be necessary pursuant to the Investment Advisers Act of 1940." (LPAs Section 6.8(a). Defendants' claimed commitment to form an IAC

was intended to convey to Plaintiffs that they would benefit from the independent expertise of other qualified investors who were investing their own funds in LBREP III in evaluating and approving the Partnership's investments.  The PPMs clearly implied that the IAC would counsel a write-down to current market value of an investment's valuation in the event of deteriorating market conditions.  Further, LPAs Section 6.8(b) stated that the General Partner "***shall consult*** with the Investor Advisory Committee with respect to its determination of the Fair Value of any Portfolio Investment that is subject to a Write-down." (Emph.added).  Indeed, in April and May 2008, the General Partner sent PPM Supplements #4 and #5 to some investors identifying two Lehman "warehoused" properties that had lost value in the market decline that would be "marked to market" (i.e., assigned a "Fair Value" based on a current market value) prior to transfer to the Partnerships, "subject to approval by the Investor Advisory Committee." But, as Defendants knew from their positions as Insiders or fiduciaries of Lehman, *all the PPMs' statements about an IAC were misleadin*g *because* no IAC was actually planned to be created, and indeed had not been created as of May 28, 2008 when twenty-six warehoused Lehman Brothers' properties were transferred to the Partnerships without marking them down to current Fair Value, nor created by July 15, 2008, when the final three properties were acquired from Lehman Brothers.  The PPMs *were further misleading because* Defendants, as they each well knew, contrary to the PPMs, did not intend to put investors "who, as a group, were representative of the Limited Partners" on the IAC.  The PPMs were misleading because they omitted to state Defendants' actual intentions, that no IAC would be created until all transfers of overvalued properties from Lehman to the Partnerships had been completed, and that no IAC review for valuation, or review for conflicts of interest in the self-dealing transactions would occur, nor would the IAC be composed of investors with similar interests as Plaintiffs, all contrary to the PPM's and LPA's representations.  Defendants knew the PPMs concealed their plan to make the transfers without obtaining consent from investors before admission as partners or from an IAC, so that investors foreseeably would have no protection in the self-dealing transactions which

proximately resulted in huge losses to Plaintiffs.

51.     Plaintiffs are informed and believe, based on widely-known events in U.S. and global real estate markets in the midst of the worst recession since the Great Depression, plus the ETF information alleged below, that Defendants overvalued the real estate they were holding by constantly changing the assumptions and placing unrealistic realizations on their analysis of the properties being "warehoused" by Lehman.  Defendants did not form an IAC to review the transfers and the valuations of the properties that had been "warehoused" by Lehman because they were concerned that an independent IAC, particularly one composed of members who had their own money "in the game," would see through their attempts to inflate the values of the properties being transferred.  One only has to look at what was happening to real estate values being professionally managed by looking at U.S. REIT ETFs and global real estate ETFs to see what Lehman and LBREP III, once it took over the properties, were doing.  The following table compares Lehman's/LBREP III's internal evaluation of its investments with U.S. and global real estate markets:

| Tracking Real Estate Market Decline Since Acquisition of LBREP III Property Acquired from Lehman Bros Holdings, Inc. | Between Acq. By LBHI & Acq. By LBREP III | Between Acq. By LBHI & 6/30/08 | Between Acq. By LBHI & 9/30/08 | Between Acq. By LBHI & 12/31/08 | Between Acq. By LBHI & 3/31/09 | Between Acq. By LBHI & 6/30/09 | Between Acq. By LBHI & 9/30/09 |
|---|---|---|---|---|---|---|---|
| US R/E Mkt. Change per RWO | -7.62% | -17.35% | -13.64% | -48.20% | -65.65% | -55.10% | -57.73% |
| US R/E Mkt. Change per VGSIX | -6.69% | -16.31% | -11.80% | -45.46% | -63.01% | -51.89% | -35.32% |
| Average of RWO and VGSIX | -7.15% | -16.83% | -12.72% | -46.83% | -64.33% | -53.50% | -46.53% |
| US R/E Mkt. Change per LBREP III | 0.63% | 2.41% | -8.87% | -26.28% | -33.92% | -41.27% | -50.33% |
| Global R/E Mkt. Change per RWX | -10.50% | -22.40% | -35.59% | -54.19% | -61.97% | -49.89% | -37.69% |
| Global R/E Mkt. Change per LBREP III | 0.00% | 2.43% | -21.57% | -39.28% | -47.66% | -48.74% | -47.86% |

52.     One also need only look at the documentation backing up the valuations used by

Lehman/LBREP III to see how they puffed up the valuations. They used "discount rates" to show that the property was marked to market, yet when it was obvious that the properties had declined in value, they adjusted the discount rate to one that would reduce or eliminate the apparent loss that would be demonstrated if they used a consistent analysis. In one property, the Toy Building in New York City, they used a totally unrealistic 5.5% cap rate for valuation and in the Fourth Quarter of 2007, at the very height of the recession crisis, they reported: "No material change in fair value. *Higher projected rent psf* offset by a slightly higher blended cap rate and a 6-month project delay." (Emph. added.)

53.    Defendants knowingly omitted to state material facts necessary to make many of the PPM statements not misleading. Such PPM statements include the following:

a.    That "LBREP III will seek to achieve compounded annual returns to the Limited Partners in excess of 18% in the aggregate . . . . LBREP III will seek to achieve attractive risk-adjusted returns by identifying and creatively structuring investments for the unique conditions of each local market." (PPM at Section I, p. 2.) *This was misleading because* the PPMs omitted to state the material facts, known to Defendants due to access to Portfo*lio Reports and confidentia*l information regarding Lehman's plans, that many or most LBREP III investments had already been "identified," purchased and held by Lehman in a market decline, and that investors would be required to assume the entire loss of market value upon transfer of the investments to the Partnerships, and would thus be immediately "underwater."

b.    That "The investment team is highly entrepreneurial and has demonstrated an ability to continually access high-quality investments for the funds. Additionally, the team employs *a highly disciplined investment process which has ensured consistency of returns* to the LBREP Funds in the past." (PPM at Section I, p. 2.) (Emph. added). *This was misleading because,* as Defendants knew from Portfolio Records, confidential information regarding Lehman's plans, plus GAAP requirements, the PPMs overstated the LBREP I and II returns by carrying investment values above Fair Value, by failing to disclose that a portion of the past

profits from LBREP I and II resulted from Lehman's repurchases, at a profit, of bridge equity transactions from those funds after limited partners had objected to the acquisitions, and because Defendants had already planned to transfer overpriced and loss-bearing Lehman legacy or "warehoused" investments to the Partnerships.

c.      That LBREP III's experienced investment team, access to deal flow, and proven investment strategy "provide a proprietary framework for achieving LBREP III's investment objectives."  (PPM at Section I, p. 2.)  *This was misleading because,* as Defendants knew from Portfolio Records, confidential information, plus GAAP requirements, the PPMs overstated the LBREP I and II returns in support of the "proven strategy," and omitted to state that Defendants' "access to deal flow" had already accumulated most investments at the market's top that Defendants intended to transfer to the Partnerships along with 100% of the losses resulting from the subsequent market decline.

d.      That "LBREP III will be supported by more than 400 Lehman Brothers real estate professionals with tremendous depth and breadth of experience in all facets of the real estate business . . . Lehman Brothers intends to directly align the interests of the LBREP Principals with those of the Limited Partners . . ."  (PPM at Section I, p. 3.)  *This was misleading because* Defendants' scheme to transfer Lehman's legacy properties to the Partnerships together with 100% of the losses to date had Defendants' actual interests completely adverse to those of Plaintiffs, as they knew from Portfolio Records and confidential information about Lehman's plans.

e.      That "The General Partner intends to employ the same fundamental, value-driven investment strategy and approach that the LBREP Funds and Lehman Brothers have historically used *to achieve superior risk-adjusted returns in the real estate sector*.  The LBREP Principals *will seek to maximize returns on investments in properties*, real estate companies, and service businesses ancillary to the real estate industry by . . . *considering multiple exit strategies to attempt to maximize total return* throughout the investment holding

period." (PPM Section I, p. 5) (Emph. added). *This was misleading because* it omitted to state the material facts that the General Partners' "value-driven investment strategy" included the plan for Partnerships' investments to be already "underwater" upon transfer from Lehman Brothers, or that the effort to "maximize returns on investments" would be hindered by purchasing Lehman's legacy properties at prices that were substantially above market value, and while omitting to disclose the very high debt load that the Partnerships would be required to assume. Indeed, it was not disclosed to investors until June 2009 (and then, buried on page 9 of the June 2009 Portfolio Review and requiring investors to do the math to ascertain the total debt load) that the total debt due on the properties acquired aggregated $1.684 billion of which LBREP III's "pro rata share" was reported to be $1.131 billion!  The September 2009 Portfolio Review changed those numbers and reported that the total debt due on the properties was $2.702 billion of which LBERP III's "pro rata share" was reportedly $1.242 billion!  Both Portfolio Reviews acknowledged that almost the entire debt was due by 2013 with the caveat, in a footnote, that "*Maturities incorporate extensions based on Asset Management assessment of viability of such extension options.*"  (Emph. added).  At the time the PPMs were published, Defendants knew all of the above from their access to Portfolio Records and other Lehman confidential information and omitted to disclose it to investors.

       f.    That "The General Partner's investment strategy will continue to be implemented through *a disciplined underwriting, investment and asset management process* undertaken by the LBREP Principals.  In particular, the senior principals will *regularly review the composition of the portfolio and ongoing pipeline to ensure that LBREP III's capital is optimally allocated*."  (PPM at Section I, p. 6) (Emph. added).  *This was misleading because* it omitted to say, as Defendants knew from access to Portfolio Records and confidential information concerning Lehman's plans, that Defendants' "investment strategy" was to spend LBREP III's capital in purchasing investments that Lehman had held for prolonged periods in a declining market and thereby to transfer 100% of the losses onto the Partnerships, which strategy

---

hardly "ensure[d] that LBREP's capital [would be] optimally allocated."

    g. That Lehman's asset underwriting approach would involve the use of "*comprehensive due diligence, resulting in a thorough analysis of each transaction's investment strategy, market risk and financing*, as well as any tax, structuring and currency risks.  Each transaction is subject to *a rigorous approval process, including multiple screenings by LBREP Principals* and final approval by Lehman Brothers' Investment Committee, which is comprised of Messrs. Walsh, Bossung and Newman as well as senior members of the Firm independent from REPE."  (PPM at Section I, p. 6.) (Emph. added).  *This was misleading because* it omitted to state, as Defendants knew from their knowledge of the declining commercial real estate markets in the U.S. and globally and access to Portfolio Records and confidential information concerning Lehman's plans, that most of the property investments to which the Partnerships would be directed had already been made well prior to the PPMs, at prices substantially higher than currently available in the declining real estate market, with the result that investors would suffer an immediate loss of value upon transfer of the investments to their Partnerships.

    h. That "Lehman Brothers' significant investment in LBREP III seeks to *ensure the integrity of the investment decision-making and monitoring process* and aligns the interest of Lehman Brothers, the General Partner and the limited partners of LBREP III."  (PPM at Section I, p. 6) (Emph. added).  *This was misleading because*, as Defendants knew from their knowledge of the crashing commercial real estate markets in the U.S. and globally and access to Portfolio Records and confidential information concerning Lehman's plans, it omitted the material fact that, rather than "aligning" Defendants with investors, Defendants' undisclosed scheme was to act adversely to Plaintiffs' interests by passing 100% of Lehman's losses on overvalued properties onto them, plus exposing the LBREP III partnerships to a total of $2.702 billion of indebtedness of which LBREP III's pro rata share was $1.242 billion, almost all of which would be due before 2013, facts that were omitted from disclosure to investors until September 2009!

       i.      That LBREP III's investment team possesses the expertise and ability to "*monitor changing economic conditions, anticipate the impact on real estate markets and act quickly and decisively* on compelling investment opportunities."  (PPM at Section I, p. 7.) (Emph. added).  *This was misleading because*, as Defendants knew from their knowledge of the crashing commercial real estate markets in the U.S. and globally and access to Portfolio Records and confidential information concerning Lehman's plans, it omitted the material fact that Defendants had evidently failed to "monitor changing conditions" or to "anticipate the impact on real estate markets" or even "act quickly or decisively" by having purchased investments in early 2007 at very high leverage and having held them through a long market decline, and the material fact that Defendants planned to transfer the investments and 100% of the losses onto the Partnerships, or that there was nothing "compelling" about the "investment opportunities."

       j.      That "A disciplined investment approach will be crucial to successfully investing in U.S. real estate over the next few years and the General Partner believes that through both its current relationships and its access to Lehman Brothers' deal flow, it is well positioned to identify and execute on local market opportunities to profit from these changes."  (PPM at Section I, p. 7).  *This was misleading because* it speaks of an approach that "will be crucial to successfully investing in U.S. real estate over the next few years," and thus implies that the funds would be used to acquire property in the future in the declining market that was underway, but omits the material fact, as Defendants knew from their knowledge of the crashing commercial real estate markets in the U.S. and globally and access to Portfolio Records and confidential information concerning the General Partner's plans, that the real estate investments to be assigned to new investors were depressed properties that Lehman had already purchased in some cases long before the PPMs were issued, that presently represented substantial losses on investments that new investors would have to absorb entirely, and that the only "local market opportunities to profit" would require that the properties first appreciate almost 43%[A1] to make up the 30% deficit that investors would inherit.

k.     That LBREP III's investment strategy "will be implemented through a *deliberate and discerning review of macro- and local-market conditions, steady and consistent analysis of a great number of potential transactions in order to identify those that the General Partner believes to offer the best risk-return profile*." (PPM at Section I, p. 8) (Emph. added). *This was misleading because* it implies that a strategy "will be implemented" in the future after "analysis of . . . potential transactions" that "offer the best risk-return profile" in the declining market underway, but omits the material fact that, as Defendants knew from their knowledge of the crashing commercial real estate markets in the U.S. and globally and access to Portfolio Records and confidential information concerning the General Partner's plans, that actually, the "potential transactions" had already been "identified" and purchased long before, so that their Fair Value would be substantially lower than the prices the Partnerships would be required to pay with investors' newly-invested funds, placing the Partnerships in an immediate loss position as a "risk-return profile" which would have to be made up before any profit could be realized.

l.     That "By aligning the activities of the division (including those of the Real Estate Private Equity Group) with Lehman Brothers' global origination platform, the General Partner believes that it greatly enhances the LBREP Principals' ability to successfully source, evaluate and execute real estate investments and *to ultimately derive value from these investments*." (PPM at Section II, p. 13) (Emph. added). *This was misleading because* it omits to state the material fact that, as Defendants knew from their knowledge of the crashing commercial real estate markets in the U.S. and globally and access to Portfolio Records and confidential information concerning the General Partner's plans, alignment with Lehman's "global origination platform" would commit REPE and the Partnerships to acquire 20 or more devalued investments from Lehman's portfolio at prices that would relieve Lehman's entire substantial loss, but place the Partnerships in a substantial (30%) loss position that would have to be overcome before they could "ultimately derive [any] value from these investments."

m.     That "The General Partner believes that LBREP III will be able to identify

ATL_IMANAGE-6887589.1

and execute on highly profitable investments, *regardless of the real estate or economic cycle*." (PPM at Section III, p. 18) (Emph. added). *This was misleading because* it speaks of some future action to "identify and execute on highly profitable investments," but omits to state the material fact , as Defendants knew from their knowledge of the crashing commercial real estate markets in the U.S. and globally and access to Portfolio Records and confidential information concerning the General Partner's plans, that the "identifying" and "executing" had already occurred earlier in 2007 in a much higher market, that the investments already represented losses which Defendants planned to transfer in their entirety to the Partnerships, along with literally billions in undisclosed indebtedness, and that the only foreseeable profit on these investments was for Lehman Brothers and Defendants themselves.

n.     That "The General Partner intends to pursue investment opportunities *only where it perceives compelling valuation and can exercise proper control*, assume acceptable levels of leverage *and identify viable exit strategies*.  The General Partner's business plan for an investment will *always contemplate potential exit strategies to maximize returns*, and General Partner will regularly revisit and *modify the anticipated exit strategy based on evolving market conditions*."  (PPM at Section III, p. 18) (Emph. added). *This was misleading because* it implies that investors' funds will be used to pursue future investments that present "compelling valuation" opportunities and "viable exit strategies," but omits the material facts, as Defendants knew from the declining global commercial real estate markets and their access to Portfolio Records and Lehman confidential information, that Lehman had already acquired many of the investment properties earmarked for LBREP III in a higher market at very heavy leverage and that transfer to the Partnerships would put their investors immediately in substantial (30%) loss positions and saddle the Partnerships with billions of dollars of undisclosed, relatively short term indebtedness in the declining market, all of which would have to be overcome before any "viable exit strategies" could be achieved.

o.     That "The General Partner will seek investments that offer significant

---

potential returns through repositioning, but will always consider the present use and condition of the underlying property to help ensure downside protection when making investment and purchase decisions." (PPM at Section III, p. 19).  *This was misleading because*, again, (i) the future tense implies that investors' funds will be used to acquire property investments as the market continues to decline and opportunities occur, and (ii) the phrase "always consider present use and condition of the underlying property" implies that properties will be acquired for intrinsic present value, *when actually*, as Defendants omitted to state but knew from Portfolio Records and confidential Lehman information, (i) the property investments intended for LBREP III had long before been acquired by Lehman in a much higher market which Defendants would transfer to the Partnerships with all accumulated investment losses and with "downside protection" only for Lehman itself, and that (ii) almost all of the warehoused properties were development projects where a substantial premium was being paid for the expected result of the development and where the present value of the property was far below the payments required of LBREP III in the development projects.

        p.      That "As of the date of this Memorandum ('October 2007'), LBREP III's investments have not been identified.  Limited Partners will be relying on the ability of the General Partner and the Investment Advisor to identify and evaluate the investments to be made by LBREP III.  Because such investments may occur over a substantial period of time, LBREP III faces the risks of changes in long-term interest rates and adverse changes in the real estate markets."  (PPM at Section X, p. 72).  *This was misleading because* it omitted to state that (i) almost eighty percent (80%) of LBREP III investments had indeed already been identified, acquired and "warehoused" by Lehman by the time the PPMs were published, that (ii) the risks of adverse changes in the real estate markets had already be realized, resulting in substantial losses that were certain to be conveyed to LBREP III Partnerships, and that (iii) an additional undisclosed risk lay in the $2.702 billion indebtedness attached to the properties that Defendants would transfer to the LBREP III Partnerships without the investors' knowledge or consent.

q.      That "The General Partner intends to employ substantially the same investment analysis, monitoring and asset management processes that were utilized in the LBREP Funds . . . . *The investment monitoring and asset management processes* . . . involve periodic reviews of valuation parameters, investment performance and disposition opportunities."  (PPM at Section V, p. 25)(Emph. added).  *This was misleading because* it suggests that the successes of LBREP I and II were as represented in the PPMs, but omits the material fact, as Defendants knew from Portfolio Records, confidential information concerning Lehman's plans, plus GAAP requirements, that those results were overstated because the property valuations for Lehman-owned real estate overlooked the market decline in progress, and also some profits resulted from repurchases by Lehman of inappropriate investments previously sold to LBREP I and II.

r.      That "Each individual team will discuss active transactions in a meeting (the "Pipeline Review") typically held *on a weekly basis* and usually attended by the LBREP Principals and LBREP III professionals. . . .  *This format allows the LBREP Principals to directly oversee all investment opportunities and allocate resources to those that they determine are most attractive*."  (PPM at Section V, p. 26) (Emph. added).  *This was misleading because* it speaks about investment "opportunities" in the future, but omits to state the material facts, as Defendants knew from Portfolio Records and Lehman confidential information, that (i) the investments Defendants planned for LBREP III greatly exceeded the normal annual $600 million investment "burn rate"  represented in the PPMs (PPM at Section IV, p.22) (ii) had been acquired by Lehman at excessive prices and with heavy leverage many months before, and (iii) had substantially declined in value and were no longer attractive "investment opportunities," especially with the burden of the undisclosed $2.702 billion in associated indebtedness to which the properties were subject.

s.      That "The General Partner *will create an Investor Advisory Committee . . . to advise the General Partner* with respect to potential conflicts of interest, to consult with the General Partner *on the General Partner's valuations for the purposes of determining write-*

*downs* of investments, if any, to provide consents as may be necessary pursuant to the Investment Advisers Act of 1940 and such other matters as the General Partner presents to the Investor Advisory Committee."  (PPM at Section V, p. 27)(Emph. added).  *This was misleading because* it implies that an IAC would be formed in time to effectively represent investors' interests in considering conflicts of interest and valuations, but it omits to state the material fact, as Defendants knew from access to confidential information concerning the General Partner's plans, that Defendants' scheme was to form an IAC only <u>after</u> the planned self-dealing transfers had been made to the Partnerships, when review for valuations, scrutiny of Lehman's support for the inflated valuations given to "warehoused" properties or conflicts of interest would be moot.

       t.     That "Portfolio investments are monitored and business plans are revised, as appropriate, as a result of a change in circumstances or periodic reviews by the Asset Management Committee."  (PPM at Section V, p. 28).  *This was misleading because* it speaks of future times when investments might become less desirable or appropriate, but omits the material fact that, as Defendants knew from access to Portfolio Records and Lehman confidential information, circumstances had already changed for the worse prior to the PPMs, the investments Defendants planned to transfer to the Partnerships had already become undesirable, especially with the burden of the $2.702 billion in associated indebtedness, and none of this was disclosed in the PPMs.

      54.     *Taken together, the foregoing representations and omissions were misleading because* they misstated how, when and at what pace Defendants would acquire investments for the Partnerships.  While the PPMs represented that the General Partner would seek to maximize risk-adjusted returns, in reality Defendants concealed and omitted the material fact that the General Partner would transfer investments to the Partnerships at inflated prices significantly above Fair Value, and that such transfers, together with the burden of the undisclosed $2.702 billion in associated indebtedness, of which LBREP III's pro-rata share was $1.242 billion, would consume a substantial share of the capital that would be available for future investments

in a declining market, causing an overall loss on existing investments and a reduced capacity to make up those losses on future investments.  The PPMs also omitted and concealed the risk that Defendants would use the Partnerships as a vehicle to dispose of overvalued assets to minimize overall losses to Lehman, and omitted to state the risk that Defendants would indeed place Lehman's interests above the interests of the Partnerships and would not appoint an independent IAC to protect the investors' interests.  As Defendants knew from their knowledge of the crashing commercial real estate markets in the U.S. and globally and access to Portfolio Records and confidential information concerning Lehman's plans, these omissions to disclose in the PPMs, as enumerated in paragraphs 42-50, made it foreseeable in the declining real estate market that investors risked incurring substantial losses on the transfer of Lehman's previously-warehoused investments at prices substantially higher than the then-prevailing Fair Value, and such risk indeed materialized, proximately resulting in investors' having to absorb losses in the hundreds of millions of dollars.

### Misrepresentations in the Limited Partnership Agreements.

55.     Defendants also circulated copies of the form of LPAs as a sales device for potential investors.  Like the PPMs, the LPAs set forth similarly misleading statements due to the omissions of material facts.  According to LPAs Section 5.1(b), "the investment objective of the Partnership shall be to achieve superior returns by making investments in Real Estate Assets, Portfolio Companies and in service companies ancillary to the real estate industry."  While the General Partner had discretion with respect to causing the Partnerships to purchase securities, LPAs Section 6.13 limited the General Partner's ability to transfer "Portfolio Investments in Progress" to the Partnerships, defined as investments under review, but not yet completed.  Such transfers could be made *only if* those transactions are disclosed and consented to directly by the Limited Partners or the IAC on their behalf.  LPAs Section 6.15(a)(iii) prohibited the General Partner from performing any act "expressly requiring the consent of the Limited Partners or the Investor Advisory Committee under this Agreement without first obtaining such consent."

Case 1:09-cv-09100-BSJ-KNF   Document 54   Filed 05/27/10   Page 46 of 90

56.     The LPAs' statements regarding the investment objectives and the General
Partner's powers were misleading because, like the PPMs, they indicated that investment
decisions would be intended to maximize the overall value of the Partnerships' investment
portfolios, but omitted to stated, as Defendants knew from Portfolio Records, that the
"warehoused" properties would cause investors to sustain a substantial and immediate (30%)
loss.  Further, Defendants intended certain LPAs' representations to persuade investors that self-
dealing transfers of Portfolio Investments in Progress would not occur absent appropriate
disclosure and consent, when, in fact, Defendants omitted to state that they had no intentions for
any such disclosure and consent.  Indeed, Defendants underreported in the Supplemental PPMs
the cost to Lehman of the legacy properties being "warehoused" and to be possibly transferred to
LBREP III by as much as $157 million.  As Defendants knew from access to confidential
Lehman information, these material omissions in the LPAs, particularly when coupled with the
material omissions in the PPMs, made it foreseeable that investors risked incurring substantial
losses upon the intramural transfer of Lehman's overpriced properties, and such risks indeed
materialized, proximately resulting in losses to investors in the hundreds of millions of dollars.

## Participation of Other Co-Conspirators

57.     Certain Doe Defendants, co-conspirators with the named Defendants but whose
names are unknown to Plaintiffs, drafted, revised, participated in and advised the General Partner
and other Defendants with respect to the drafting of all of the foregoing material
misrepresentations and omissions contained in the PPMs, the Supplements, the LPAs and other
documents issued to Plaintiffs as alleged herein.  Said Doe Defendants conspired and
participated in drafting the documents knowing that they were intended to be relied upon by
investors.  Said co-conspirators further knew, or were reckless in not knowing, of the continuing
decline of the real estate market and knew, or should have known, of the substantial risks or loss
to investors in the limited partnerships when the "warehoused" properties would be finally
transferred to the Partnerships, and that the PPMs and other documents alleged herein contained

*Second Amended Complaint for Securities Fraud and Fiduciary Breaches*                    Page 42

ATL_IMANAGE-6887589.1

material misrepresentations or omissions.  Said Doe Defendant co-conspirators played such a substantial role in drafting and creating the misrepresentations and omissions that they can be said to be the "authors" or "co-authors" of the statements.  Said Doe Defendants knew that omissions of material facts made the PPMs' representations with respect to the acquisition and transfer of investment properties materially inaccurate, in view of the fact that Lehman had "warehoused" dozens of legacy properties intended for later transfer to LBREP III, and that thereafter the real estate market had fallen substantially.  Said Doe Defendants knew that transfer of the property investments to the Partnerships would put investors like Plaintiffs in a substantial loss position at the outset of the Partnerships, and had a duty to correct the material omissions therein and to disclose the very real prospect of a substantial loss in investment value upon transfer of property investments to the Partnerships.  The material omissions alleged herein posed a foreseeable risk to Plaintiffs, that said Doe Defendants knew about, co-authored and failed to correct, directly and proximately causing the damages to Plaintiffs as alleged herein.

### The Gambit of "Future Investments"

58.    The PPMs for the Partnerships were issued by October 2007.  Both stated, *albeit* misleadingly due to material omissions, that "[a]s of the date of this Memorandum, LBREP III's investments *have not been identified*.  Limited Partners will be relying on the ability of the General Partner and the Investment Advisor *to identify and evaluate* the *investments to be made by LBREP III*.  Because such investments *may occur over a substantial period of time,* LBREP III faces the risks of . . . adverse changes in the real estate markets" (PPM at Section X, p. 72)(Emph. added).  *These representations were misleading because* they suggested that Defendants would select investments of value in the upcoming months as opportunities arose in the declining market.  Defendants knew, due to their access to Lehman confidential information and Portfolio Reports, that these PPM statements were false due to the material omissions that Lehman had already "selected" the investments, the market risks had already been incurred, and the investments already made long before any future "opportunities" could arise, proximately

resulting in losses which Defendants intended to pass on to Plaintiffs, in an vain attempt to salvage the Lehman *illiquidity*, based partly on its overvalued properties, that Mr. Odrich would soon attempt to conceal.

59.    On March 18, 2008, before any Plaintiffs had sent funds for investment, Defendant Mr. Odrich sent a letter to Lehman clients regarding the "unprecedented stress in the financial markets" that was occurring at the time.  Mr. Odrich spoke of Lehman's focus on the "significant opportunities created by extensive dislocations in the credit and equity markets."  Mr. Odrich touted the "outstanding flow of investment opportunities" coming from the Lehman Brothers' platform, and emphasized that Lehman "remain[ed] extremely disciplined in evaluating these opportunities and selectively investing in the most compelling situations."  In closing, Mr. Odrich reassured Lehman Brothers' clients that "we remain confident about our financial condition and our ability to deliver . . . outstanding investment performance on your behalf."

60.    Then, the Odrich letter glowingly misrepresented Lehman Brothers' financial situation, which was actually dire, and also misrepresented Lehman Brothers' intention to maintain an "extremely disciplined" evaluation and selection approach to "capitalize on the outstanding opportunities for making new investments."  As the PPMs had done, the Odrich letter falsely suggested that the investments would be identified *in the future,* after Lehman had analyzed the potential opportunities for optimal results for LBREP III, when, in fact, Defendants had always intended to favor Lehman's interests over LBREP III's, and the "opportunities" suggested were not possible as Lehman had already acquired all properties to be transferred to LBREP III.  On information and belief, based on his access to Lehman confidential information, Mr. Odrich knew that the representations of his March 18, 2008 letter were false and misleading, as he knew of the market decline, the "warehousing" of legacy properties months previously at substantially higher prices than currently prevailing, and the Lehman plan to transfer these overvalued properties to the Partnerships which would cause them a substantial, immediate loss.

61.    Two days after the Odrich assurances, on March 20, 2008, the General Partner

sent out its first 20% Capital Call to all the Limited Partners of LBREP III.  This Capital Call totaled $640 million, consistent with the $600 million per year investment rate represented by the PPMs.  What was omitted, however, was that Defendants planned to cause LBREP III to borrow a like sum and purchase $1.2 million of "warehoused" properties from Lehman Brothers which was subject to $2.702 billion of relatively short term debt without investors' consent or any independent review of the Fair Value of assets.

62.     Both the *PPMs and the Odrich letter were misleading because,* as Defendants knew, they both stated or strongly implied that the General Partner's investment analysis of risk lay in the future, under market conditions to be then encountered, and omitted to state that those risks had already been realized as current losses by Lehman for its own account, and that Defendants' plan was to pass the losses on to investors such as Plaintiffs.  The PPMs concealed the actual risk that Defendants intended to use the Partnerships as vessels for dumping devalued "warehoused" properties in Lehman's portfolio at inflated prices to generate capital for Lehman, the very scenario that indeed occurred.

63.     In hindsight, Defendants' scheme began to emerge on May 8, 2008, after all Plaintiffs had signed Subscription Agreement commitments and were admitted as Limited Partners and then paid the Capital Calls.  On that date, the General Partner disclosed, in PPM Supplement #5, that it planned to transfer 26 Subject Investments to the LBREP III Partnerships that had *already* been acquired by Lehman.  Of those 26, 21 had been acquired before Plaintiffs were admitted as limited partners, and almost all had been previously listed in Supplements #1 and #2 as mere "possibilities."  Thus, contrary to the PPMs' representations, over half of the LBREP III investments had *indeed* been identified prior to the PPMs' October 2007 date of publication.  Plaintiffs were harmed when the concealed risk -- the transfer to Plaintiffs of overvalued prior investments – materialized to substantially lower the value of their portfolio.

64.     The PPM Supplements distributed by the General Partner had stated amounts that Lehman Brothers had paid for the investments as of November 27, 2007 or thereafter, but

misleadingly omitted to state the material fact that the amounts had been paid well before that date, some nearly 13 months previously, near the market's top, or that many had been acquired even before the June 25, 2007 formation of the LBREP III partnerships.  The Supplements stated only the dates that Lehman's own Investment Committee had approved the investments, but omitted the material fact of the dates when such investments had actually been made.  In fact, as Defendants knew from Portfolio Information and confidential information, the investments had been made substantially prior, so that the "risk(s) of adverse changes" in the real estate market had already been realized during Lehman's period of sole ownership for its own account.

65.     On information and belief, based on Defendants' specialization in real estate investment, Defendants knew that the market was dropping and that the then-current Fair Values of most Subject Investments were substantially less than the prices that Lehman had paid for them.  The PPMs stated that Lehman-owned investments would be transferred at their acquisition cost plus its cost of carry, not to exceed 9% per annum.  Yet, as Defendants knew from their participation in the PPMs, the PPMs omitted to state the very real risk that Plaintiffs' would inherit substantial losses at the outset when their Partnerships acquired the investments at prices far higher than Fair Value.  Defendants knew that the PPM references to "future acquisitions" omitted the foreseeable risk to investors of having to incur substantial losses from transfers of "warehoused" properties at prices far over current market values, which risk indeed materialized, proximately causing investors to absorb losses of hundreds of millions of dollars.

## Lehman Brothers and the 2008 Economic Climate

66.     As widely reported, the worldwide real estate market declined continuously throughout 2007-2008, leading eventually to what has been called the "biggest economic firestorm since the Great Depression."  (Jenny Anderson and Charles Duhigg, *Flirting With Disaster*, N.Y. Times, Sept. 21, 2008).  In May 2008, Lehman Brothers was suffering from the downturn in real estate values, and the excessive risk and leverage which it had undertaken.  On May 31, 2008, immediately after the transfers to LBREP III, the U.S. Office of Thrift

Supervision concluded its examination of Lehman, finding that Lehman "did not employ sound risk management practices in its commercial real estate business (Examiner's Report, 46). This leverage and resulting illiquidity ultimately led Lehman to file bankruptcy on September 15, 2008. As subsequently reported in the *Washington Post* concerning the prior year's events, "Lehman's increasingly aggressive investments in real estate and securities tied to mortgages caught up with it. With property values falling, the bank began to report large losses. To protect healthier segments, the firm tried to spin off the majority of its commercial real estate assets into a separate holding company. But the move failed to assure investors and Lehman's stock went into a tailspin, forcing the firm to seek bankruptcy protection." (Alejandro Lazo, *D.C. Deals Relied on Lehman Funding; Bank Was Monument's Main Financing Source*, Washington Post, Sept. 22, 2008 at D1). During the same time period, the values of the Partnerships' investments also declined significantly. On September 10, 2008, Lehman pre-announced a $3.9 billion net loss for its third quarter of 2008, as well as a number of initiatives to bolster its financial viability. Lehman's troubles were primarily associated with illiquid mortgage and real estate-related securities. The LBREP III unaudited 2008 3rd Quarter Financial Statements dated September 30, 2008 stated that the Subject Investments had declined in value by approximately 27%, although the General Partner delayed reporting this to Plaintiffs until a December 5, 2008 email. The audited 2008 Annual Report had the value declining by 26% for the U.S. properties (14% of the total) and 39% for the global properties (86% of total) and the 1st Quarter 2009 Financial Statements had the value declining by 34% and 48% respectively. In the 2nd Quarter 2009 Financial Statements the values had declined to 41% and 49% respectively, and were finally in line with the decline in U.S. and global real estate generally. (See Chart, ¶ 59).

      67.     On May 21, 2008, David Einhorn delivered an address at the Ira W. Sohn Investment Research Conference in New York that was widely reported in the business press. (E.g., Bloomberg.com, May 22). Mr. Einhorn checked his facts on the previous day by email with Erin Callan (Examiners' Report, 714). As he had done in a speech on April 8, 2008, Mr.

Einhorn heavily criticized Lehman's accounting methods, which, he said, did not value its commercial real estate assets based on market values as required by GAAP. In the days following, Lehman Brothers sustained multiple attacks from numerous publications, which questioned not only Lehman's stock but also its reputation. (L. McDonald, *A Colossal Failure of Common Sense,* p.305, Crown Publ., 2009). Right away, Lehman's common stock closing prices began to fall precipitously. Within six weeks, by June 30, 2008, the stock would fall 50%. Plaintiffs are informed and believe, based on Lehman-filed SEC disclosures, that the personal investment portfolios of the Insider Defendants each included large amounts of Lehman restricted stock that had recently had paper value in the millions of dollars, but now was dropping precipitously in value, and some could not be sold due to the restrictions imposed on the Insiders' shares. Further steep erosion in Lehman's stock price was expected soon, due to the pressure to write down real property values during Lehman's 2nd Quarter ending May 31, 2008. The Insider Defendants knew, as investment bankers, that diminished property values due to mark-downs would require Lehman to recognize several billions of losses for the 2nd Quarter, which would cause the Lehman stock to plummet further. But they also knew, of course, that transfers of overvalued properties without reduction in valuation would remove the properties from Lehman's books and avoid loss recognition on them. The Partnerships thus represented an emergency exit for the Insider Defendants.

68.     On information and belief, based on a January 26, 2009 Bloomberg.com report found at http://www.bloomberg.com/apps/news?pid=20601103&sid=alMpGZaBLtag, and http://cityfile.com/dailyfile/5866 and other news reports, Defendant Fuld purchased a residence at Jupiter Island, Florida in March 2004 for the sum of $13,750,000, as reported by Cityfile.com. On information and belief, on the same basis, Defendant Fuld "sold" the Jupiter Island property to a co-conspirator for the total sum of $100.00 in November, 2008, according to Florida real estate records, as reported by Reuters on January 25, 2009.

69.     On information and belief, at the time of the above transfers, Lehman Brothers

was in bankruptcy and Defendant Fuld was unemployed, having been involuntarily removed from his positions without any bonus or severance, and facing legal claims from irate investors totaling many millions of dollars, made the transfers alleged herein with actual intent to hinder, delay and defraud LBREP III investors such as Plaintiffs, without receiving a reasonably equivalent value in exchange therefor, and said Defendant believed they would incur debts beyond Fuld's ability to pay.  Said transfers were fraudulent as to Plaintiffs, who are entitled to obtain Avoidance of the transfers to the full extent necessary to satisfy their claims, and Plaintiffs are also entitled to attachment or other provisional remedy against said transferred assets and the proceeds from any sales thereof, an injunction against further disposition by Defendant Fuld, and also the appointment of a receiver to take charge of said properties, all in accordance with the New York, Florida and Idaho-enacted versions of the Uniform Fraudulent Conveyances Act.

### The May 28th Transfers of "Underwater" Lehman Property Investments

70.     On May 28, 2008, in the face of tumbling Lehman Brothers stock values and property markets, Defendants arranged to transfer twenty-six Subject Investments from Lehman Brothers to the LBREP III Partnerships.  Plaintiffs were unaware of these transactions when they occurred and therefore were also unaware of the transfer prices paid by the Partnerships.  Not coincidentally, the May 28th transfers were just three days before the end of Lehman Brothers' fiscal 2nd Quarter ending May 31, 2008, and thus, completed in time to eliminate any need by Lehman Brothers to mark those investments to market and report the resultant losses on its fiscal 2nd Quarter financial statements and 10K SEC filing.  This didn't eliminate Defendants' obligation to substantially write down to Fair Value the investments Lehman acquired on May 28, 2008 at the end of the Partnerships' 2nd Quarter ending June 30, 2008, but the General Partner elected, in violation of its specific obligations under all LPAs, to not send Partnership financial statements for the 2nd Quarter, all while Lehman got the problem off its books as well. May 28th therefore presented Lehman and Defendants with their "window of opportunity."

71.     Plaintiffs are informed and believe, based on the description of Lehman's real

estate business practices described in the May 3, 2009 *New York Times* article entitled "How Lehman Brothers Got Its Real Estate Fix," that some of the Subject Investments were in actuality what Lehman Brothers called "bridge equity" positions whereby Lehman Brothers obtained substantial fees from developers for finding or committing equity for these high-risk projects. Insider Defendants had full knowledge that Lehman Brothers had received these fees, which substantially reduced their actual cost of acquiring an underlying investment that was subsequently sold to LBREP III.  One such "bridge equity" position which the Examiner reports that Lehman acquired in 2007 was the Toy Building at 200 Fifth Avenue, New York, N.Y., that was later transferred to the Partnerships (Examiner's Report, 108).  By the end of 1st Quarter 2009, the $24.5 million paid for the Toy Building position had been written down to zero.

## The Delay in Disclosing the Transactions

72.     After the May 28th transfers of Lehman properties, the General Partner was soon required to provide the Limited Partners with financial statements.  LPAs Section 8.2(c) stated that financial statements would be provided within sixty days after the end of the each fiscal quarter, and for the 2nd Quarter 2008, that meant by August 30th.  The PPMs also represented that "the General Partner also will send the Partners unaudited financial statements and other information on a quarterly basis."  (PPM at Section IX, p. 69.)  These representations were material, because the General Partner adopted Fair Valuation principles of FASB Statement No. 157 on January 1, 2008, and thus financial statements as of June 30th should have included a Fair Valuation of the Subject Investments acquired on May 28th.  Nevertheless, Defendants failed to provide the June 30th financial statements within the required timeframe, or at all, or explain why they were not provided.  Plaintiffs are informed and believe, based on Defendants' access to Portfolio Reports and their business practices, that financial statements were not provided in order to avoid disclosing the transfer of the Subject Investments, *plus* the exorbitant transfer prices paid by the Partnerships *versus* their reduced Fair Value as of June 30, 2008.  Because the duty stated in LPAs Section 8.2(c) is clear, Defendants' intentional omission of any June 30th

financial statements intentionally misled Plaintiffs by temporarily concealing the May 28th transactions and the material information regarding the Fair Value of the Subject Investments and the exorbitant prices paid to Lehman by the Partnerships.  The omissions of financial statements were part of Defendants' scheme to sell LBREP III partnership interests and use proceeds to help Lehman unload its over-valued real estate assets to investors at inflated prices without investors' knowledge or consent.  While Defendants prepared Portfolio Reports for June 30, 2008 that actually showed that the Portfolio Investments had gained 2.4% in value since their acquisition by Lehman, it achieved those incredible results by changing the assumptions contained in those reports in such a way as to inflate the values instead of recognizing the obvious losses.  Examples include:

a.      In the Toy Building they decreased the discount rate to 21% and reported that the $10.8 million increase in cost for improvements was more than offset by being closer to a realization event, and increased the value of the property by $1.1 million.  Three months later they took a $10.4 million reduction to Fair Value and by the 1st Quarter of 2009 had fully written off the $24.6 million investment.

b.      West 44th Street would have produced a $2 million write down using a consistent discount rate as used in prior Portfolio Reports; instead they lowered the discount rate by one percent to reduce the loss to less than $200,000, which was more than offset by the write-up of the Toy Building.

c.      Chancerygate reported a reduction in Fair Value of $500,000, which was reported as "no material change in value."

d.      The U. K. Residential Portfolio increased the discount rate by 1% and produced a $1.1 million increase of Fair Value to offset Chancerygate.

e.      Rightway, China used a 4% reduction in the discount rate to convert a $3.3 million reduction in Fair Value to a $270,000 gain in Fair Value.

73.      Plaintiffs only learned that LBREP III had acquired the Subject Investments and

the prices paid for the Subject Investments on December 5, 2008 when they finally received the financial statements for the LBREP 2nd Quarter ended September 30, 2008.  Plaintiffs only learned of the undisclosed $2.702 billion of short-term indebtedness associated with the properties that LBREP III had acquired upon receiving the Portfolio Review in September 2009.  The 2nd Quarter financial statements arrived well after the last limited partner in any Parallel Fund had committed their capital in the final closing of LBREP III Partnerships on August 29, 2008.  Thus, while Defendants delayed about 7 months to disclose terms of the property transfers and 15 months to disclose the $2.702 billion short term debt obligations to which the property was subject, Plaintiffs had foreseeably suffered an immediate loss in the value of their investments, as Defendants expected and intended by their PPM omissions.  Plaintiffs' precise loss amount is presently undetermined pending discovery, but Plaintiffs are informed and believe that the loss on transfers of $1.2 billion of overvalued "warehoused" property from Lehman Brothers to the LBREP III partnerships would exceed over $500 billion based on the assumption that an independent IAC, if presented with sufficient facts to make an intelligent determination, would have rejected almost all of the properties actually transferred.  At a minimum, however, the loss is at least $300 million, based on reports of the analyses of Lehman's real property portfolio by experts from potential purchasers Citigroup, Credit Suisse, Deutsche Bank and Goldman Sachs who found that Lehman's $32.6 billion in commercial real estate holdings were overvalued by as much as 35%. (*Fortune,* December 15, 2008)("the assets should probably have been $12 billion lower").  That minimum $300 million amount of estimated loss includes both the inflated amounts at which the properties were carried in "warehouse" inventory, but does not include the lost opportunity costs represented by the assumed decision of a hypothetical IAC that the valuations of Lehman's legacy properties were excessive, were subject to too much short term debt, and that good faith to investors required that their investment funds be utilized to pursue new opportunities presented by the declining real estate market.  Further, the September 30th LBREP III financial statements delivered December 5, 2008 showed that to the extent any

disclosure was made to the limited partners about the "warehoused" properties being acquired, the price which Lehman reportedly paid for those properties was understated by $157 million when comparing the amounts shown in Supplemental PPMs with the amounts reported in the 3rd Quarter 2008 Financials, which amounts do not account for Lehman's failure to carry properties at Fair Value. Defendants' failure to timely and accurately disclose information regarding the transfers prolonged Plaintiffs' ignorance of the true facts. The absence of information, plus the General Partner's May 2008 representations in PPM Supplements #4 and #5 that properties would be "marked to market" and approved by the IAC prior to transfer, gave Plaintiffs no reason to suspect that the Subject Investments would be carried considerably above Fair Value and would be transferred without the approval of the IAC. On information and belief, based on their knowledge of duties under LPAs Section 8.2(c), Insider Defendants' 7-month delay to disclose the investments was a knowing and deceptive device in connection with Plaintiffs' purchase of securities that served to prolong the concealment of material facts related to the transfers on unfair terms prior to the transactions having been consummated. Plaintiffs were harmed when the concealed risk, that Insider Defendants would not follow LPAs Section 8.2(c), nor GAAP, nor avoid financial manipulation, nor reflect Fair Value of investment properties, materialized to substantially lower the value of their investments. Insider Defendants derived a personal benefit from their delay in disclosing the transactions until arrival of the September 30th financials on December 5, 2008, following the Lehman bankruptcy, since the non-disclosure helped support the Lehman stock price while multiple Insiders Defendants were selling Lehman stock in mid- to late-2008.

### The "Interested" Transactions and Investment Advisors' Act of 1940

74.   As alleged, during early 2007, Lehman had invested, at its own risk, in real estate properties which it classified in the PPMs as "Portfolio Investments in Progress" (the "Subject Investments"). But even Defendants' phrase "Portfolio Investments in Progress" was misleading, as Defendants knew from access to Portfolio Reports and confidential information,

since Lehman had made binding commitments and had paid for many such properties long before the PPMs were even issued.  Yet, to the contrary, as Defendants knew, LPAs Article I defines the term as a "*potential* Portfolio Investment *under review* . . . if either a letter of intent . . . or other definitive agreement to invest (which . . . may be subject to conditions . . . *making such agreement non-binding*) has been entered into . . " (Emph. added).  According to the LPAs, many of the transactions did not involve a "potential Portfolio Investment "*under review."*

75.    Defendants' transfers of the Subject Investments to LBREP III were "interested," self-dealing transactions, requiring consent by investors under the Investment Advisors Act of 1940.  In these transactions, Lehman and Defendants together knowingly acted as principals in selling investment securities without proper disclosure or informed consent of Plaintiffs, their clients, as required by section 206(3) of the Investment Advisors Act of 1940.  Defendants were subject to said statute and regulations such as 17 CFR §275.206(3)-(2) and SEC Release No. IA-1732, which require (i) a written consent prospectively authorizing the completion of such self-dealing transactions ("agency cross transactions for an advisory client"), (ii) after *full disclosure* including pricing and "best price" to enable the client to make an *informed decision* to consent to the transaction, with (iii) the Investment Advisor and affiliated parties consistently acting in the best interests of the client.  Defendants failed to obtain the required informed consent, or any consent, to their scheme to transfer the Subject Investments to the Partnerships at prices substantially above then-market value or Fair Value.  By this failure to obtain investors' consent, by the PPMs' descriptions of the IAC to be formed, and the LPAs' and Subscription Agreements' requirement that investors commit to paying their full Capital Commitment before any specific property investments were identified to the Plaintiffs, Defendants knowingly defrauded Plaintiffs by passing on to them the losses Lehman had previously incurred by purchases for its own account.

76.    Defendants' scheme for self-interested transfers of the Subject Investments to the Partnerships was misleadingly described due to material omissions in the PPMs, the original of

which stated that "following the closing, LBREP III may purchase from Lehman Brothers investments that have been previously made by Lehman Brothers and that are within LBREP III's investment objectives.  While it is required that any such transaction will be made only on terms . . . determined by the General Partner to be fair and reasonable to LBREP III, Lehman Brothers *may have an incentive* to seek to refer or recommend such transactions to LBREP III, or to cause LBREP III to pay a higher price . . . *as a result of Lehman Brothers' or its affiliates' financial interests in such investments.*"  (PPM, Section X, pp. 83-84)(Emph. added).  *The PPMs statement is misleading because* it purports to state only the truism that interested parties have an *incentive* to benefit themselves.  The PPMs statement omits the material additional facts that, at October 2007, when the PPMs were distributed, Defendants knew, or were reckless in not knowing, that the value of the Subject Investments had been falling in a declining market, credit markets had tightened to a point where refinancing debt was very difficult, and the properties being considered for acquisition were subject to literally billions of dollars of short term debt, the refinancing of which could be extremely difficult.  After Plaintiffs had committed to invest in the Subscription Agreements, Defendants distributed the six Supplemental PPMs on November 28, 2007, December 28, 2007, February 28, 2008, April 11, 2008, May 8, 2008 and July 9, 2008.  During that entire period, real estate prices had continued a sharp decline and Defendants knew, on each occasion, that the Fair Value of the properties "warehoused" by Lehman was substantially lower than the prices at which Defendants intended to transfer them to the Partnerships, and that Defendants' plan would cause an immediate loss to Plaintiffs by such transfers.  Yet, consistently with the original PPMs, none of the Supplemental PPMs disclosed to investors that the Partnerships would be required to inherit the accumulated loss positions of the Lehman legacy properties that Defendants intended to transfer to them, nor did any of them disclose any information about the huge short term debt obligations to which those properties were subject.  Defendants omitted and concealed the inevitable fact of such losses to be transferred but knew that investors would surely inherit Lehman's losses on such properties.

---

ATL_IMANAGE-6887589.1

Defendants each derived personal benefit from such deception in that investment funds were
thereby attracted and obtained, Lehman's stock price was supported and Insider Defendants were
selling their Lehman shares that were, or had come, free of restrictions, and Insider Defendants
were enabled to obtain LBREP III limited partnership interests in their own right.  Plaintiffs were
harmed when the concealed risk -- the transfer to Plaintiffs of devalued legacy properties –
actually materialized to reduce substantially the total value of their portfolio.

### The General Partner's Failure to Seek Approval of the Transactions

77.     On information and belief, based on Defendants' access to Portfolio records,
confidential information and knowledge of current market conditions, Defendants failed to seek
any adequate, informed consent from limited partners for the transfers because Defendants knew
the transactions were unfair and would not be approved.  Certainly no effort was made to obtain
consent from an unaffiliated IAC, despite PPM representations that the General Partner would
create an IAC to consider its self-interested transactions for fairness to investors. (PPM at
Section V, p.27).  LPAs Section 6.8(b) stated that the IAC "shall be empowered to waive any
conflicts of interest," and the PPMs stated, while omitting material facts, that the IAC will
consult with the General Partner "for the purposes of determining write-downs of investments."
(PPM at V, p.27).  *Those statements were misleading because,* as of May 28, 2008, as
Defendants knew from operations within Lehman and the General Partner, no IAC had been
formed when Lehman made the self-dealing transfers at prices far over Fair Value, despite the
obligation under contract and the Investment Advisors' Act of 1940 to create an unaffiliated
committee to consider the conflicts inherent in such self-interested transactions.  Thus, as they
had planned, Defendants transferred the Subject Investments to the Partnerships with no
mechanism to protect investors by any independent review.  The Insider Defendants derived a
personal benefit from the transfers to Partnerships, as they were thereby enabled to engage in
unchallenged, self-dealing transactions from Lehman to the Partnerships, which in turn
supported the Lehman stock price by removing the transferred assets' losses from the Lehman

ATL_IMANAGE-6887589.1

financial statements while Defendants were selling Lehman stock in mid-2008 with knowledge of the dismal Lehman finances. Plaintiffs were harmed when the concealed risk -- that Defendants would not form an IAC until after the transfers, when any independent review of the devalued properties would be moot – materialized to substantially lower their investments' value.

78.     Similarly, Defendants also failed to make any effort to *directly* disclose the terms of the self-dealing transactions to LBREP III Partners to obtain the needed consents. LPAs Section 6.13 stated an alternative means to obtain consent from a majority of limited partners, providing that consent would be deemed to have been given if the transaction were disclosed *before the investor is admitted as a limited partner.* But this never occurred, for two separate reasons:  (i) Plaintiffs were admitted as limited partners on November 30, 2007 upon acceptance of their Subscription Agreements, nearly six months before Supplement #5 finally identified the properties to be acquired; and (ii) even then, Defendants' Supplement #5 failed to disclose sufficient information about the property transactions to permit any informed consent, as required by section 206(3) of the Investment Advisor Act of 1940 or section 10(b) of the Securities Exchange Act of 1934. The details of the transactions had to wait nearly seven more months after consummation before the prices paid were finally disclosed in the September 30, 2008 financial statements finally distributed in December of 2008. But that was too late – the unfair, self-dealing transactions had already occurred, and "consent" had become moot. Plaintiffs were harmed when this concealed risk, that Defendants would not reveal details of "interested" transactions as required by the Investment Advisors Act of 1940, until long after the transfers were already completed, materialized to lower the total value of their portfolio due to the unfairness of the "interested" transactions. The Insider Defendants derived a similar personal benefit from their failure to obtain *direct* investor consent to the transfers, as they thereby engaged in unchallenged, self-dealing transactions from Lehman to the Partnerships, which supported the Lehman stock price by removing the transferred assets' losses from the Lehman financial statements while Defendants sold Lehman stock in mid-2008.

### GAAP Principles and "Mark to Market" Obligations

79.    The PPMs omitted further material facts regarding the General Partner's accounting practices, stating that "[t]he *net asset value* of the Portfolio Investments . . . will be calculated in accordance with values determined. . . in accordance with guidelines prepared *in accordance with generally accepted accounting principles."*("GAAP") (PPM at Section X, 86)(Emph. added). *That statement is misleading because*, as Insider Defendants knew from access to Lehman Portfolio Records and financial information, neither Lehman nor the General Partner followed GAAP in valuing the Subject Investments that were transferred to LBREP III. GAAP includes the official Statements of the Financial Accounting Standards Board ("FASB"), and FASB Statement No. 157 defines Fair Value as a "market-based measurement," and states that "a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset."  In turn, FASB Statement No. 144 states that, for "long-lived assets" [e.g., real estate] to be disposed of by sale, the accounting model requires its measurement of value at "the lower of its carrying amount or Fair Value less cost to sell."  The phrase commonly used to refer to an adjustment required by GAAP is to "*mark to market*," which means to reflect value based on estimated current Fair Value.  Yet, despite Lehman's GAAP-compliance pretense, the Subject Investments were not valued at then-current Fair Value, despite being "long-lived assets" held for sale by Lehman within the meaning of FASB Statement No. 144.  On information and belief, based on Insider Defendants' access to Portfolio Records and Lehman financial information, Defendants knowingly omitted to disclose, in the PPMs and Supplements, the material facts that the General Partner and Lehman did not "mark to market" the Subject Investments, despite Defendants' claims of GAAP compliance.  Indeed, in some instances Insider Defendants avoided mark-downs by changing the assumed discount rate assigned to a property, or by increasing the capitalization rate by raising the pro-forma assumed rents from a property, such as the Toy Building in New York.  Defendants had guilty knowledge of the "mark to market" obligation for investments to be sold to LBREP III, as shown next:

80.    Shortly before the May 28, 2008 transfer of 26 properties, Supplements #4 and #5

had each stated for some "warehoused" investments: "Given current market volatility, the shares of the publicly-listed Pangbourne and Impact investments [described in a previous supplement] have lost value since initial acquisition.  It is currently anticipated that these investments will be *marked to market and transferred to the Fund at current value*, subject to approval by the Investor Advisory Committee." (Emph. added).  While these investments were not apparently transferred to LBREP III nor reviewed by any IAC, almost all other properties that were transferred to LBREP III had also lost significant value by the transfer date, May 28, 2008.  Yet, in spite of these statements only three weeks before the actual transfer, the transferred investments were neither marked-to-market nor submitted for approval to any IAC, *since no such committee had yet been created,* a fact concealed from the investors by the Defendants.  Furthermore, Plaintiffs are informed and believe, based on their review of the Portfolio Records, that no attempt was made by Defendants to ascertain the Fair Value of the transferred property prior to the May 28th transfer to LBREP III.  Thus, although the PPMs represented that investment values were determined under GAAP, the PPMs omitted to state, as Defendants knew from access to Portfolio records and Lehman confidential information, that (i) the values of Partnership investments would differ materially from values that would result from an arm's-length negotiation, or to state that (ii) neither informed investor consent nor IAC review would occur to evaluate the Lehman properties transferred to the Partnerships and protect Plaintiffs.  Plaintiffs were misled by such omissions from the PPMs into assuming that Partnership investments would reflect Fair Value, and that an independent IAC would consider the Fair Valuation of properties transferred to protect the investors' interests.  Such an inference could be fairly drawn from the 5th Supplemental PPM statement that ". . . the Pangbourne and Impact investments have lost value since initial acquisition . . . (and) will be marked to market and transferred to the Fund at current value, subject to approval by the Investor Advisory Committee" that all of the investments being considered would be acquired at current or Fair Value.   Plaintiffs were harmed when the concealed risk -- that Insider Defendants would not

---

follow GAAP, nor avoid financial manipulation, nor reflect Fair Value of investment properties, nor create an IAC – materialized to substantially lower the total value of their investments and cause their Partnerships to invest in properties that were totally inappropriate for the investment objectives iterated by Defendants in the PPMs.  Insider Defendants derived a personal benefit from these fraudulent practices which tended to support Lehman's stock, as multiple Insider Defendants were selling personal holdings of Lehman stock during 2008 near the time of the property transfers, as shown by SEC disclosures.

<u>**No Independent Review of Property Valuations**</u>

81.     Indeed, an IAC would have been the appropriate body to consider "mark-to-market" write-downs of the Subject Investments, considering the representations to investors. LPAs Section 6.8(b) provided that "[t]he General Partner *shall consult with* the Investor Advisory Committee with respect to its determination of the Fair Value of any Portfolio Investment that is subject to a Write-down." (Emph. added).  The PPMs also stated that "the purpose of the [IAC] *will be* to advise the General Partner with respect to potential conflicts of interest, *to consult with the General Partner* on the General Partner's *valuations for the purposes of determining write-downs* of investments, if any."  (PPM, Section V, p. 27)(Emph. added). Moreover, the October 2007 LBREP promotional materials for Fund III stated that "transfers [of Investments in Progress] to the Fund will be subject to approval by the Investor Advisory Committee." (Confidential Presentation, Lehman Brothers Private Equity, p.5, fn.2; and p.12, fn.1).  A subsequent version of that "Confidential Presentation" given to one of the Plaintiffs on October 24, 2008, but still bearing the October 2007 date, made a slightly amended version, stating instead that "transfers . . . will be subject to approval *by investors or* the Investor Advisory Committee.  (*Id.*)  A very subtle change, but this revision foreshadowed further developments and concealed the omitted facts that, contrary to the PPMs' and LPAs' above-quoted representations, Defendants had no intention of forming an independent IAC to consider fair valuation, conflicts of interest, or any other investor protection before properties were

transferred off Lehman's books.

82.    *All such statements were misleading, due to* the omission to state that the General Partner did not create, nor intend to create, *any* IAC in spite of the fact that seven months elapsed between (i) the admission of Plaintiffs as limited partners, whose interests an IAC would protect, and (ii) the transfers of properties from Lehman, in which IAC protection was needed. On information and belief, based on their failure to timely form an IAC, plus access to confidential information, Insider Defendants never intended to create an IAC prior to the transfers despite their representations, and Defendants intended instead to execute those self-dealing transactions without proper disclosure or consent. Plaintiffs were harmed when this concealed risk -- that Insider Defendants would dishonor their obligation under the Investment Advisors Act of 1940 to seek investor consent directly or through an unaffiliated committee– materialized to allow the property overvaluations to remain unchallenged, causing the Partnerships to acquire interests in properties that were inappropriate for their investment objectives, depleting the Partnerships of investment capital to make opportunistic investments in the declining market. In this way, Plaintiffs were stuck with inappropriate investment properties and a substantially depleted investment value due to the unfairness of the "interested" transactions. Insider Defendants derived a personal benefit from their failure to obtain IAC review or investor consent, enabling the unchallenged, self-dealing transactions from Lehman to the Partnerships, which supported the Lehman stock price by removing losses from Lehman financial statements while Defendants were selling Lehman stock in mid-2008.

### Undisclosed Amounts Required by the Transactions

83.    As noted, the September 30th financial statements disclosed that the Partnerships' expenditures on account of the Subject Investments exceeded by $157 million the prices Lehman stated it had paid for the investments in the Supplemental PPMs. On the surface, this was counterintuitive since world real estate markets had declined dramatically during Lehman's "warehousing" of investments prior to LBREP III. On information and belief, based on Portfolio

ATL_IMANAGE-6887589.1

documents Insider Defendants produced in the Delaware action, after numerous informal refusals, the explanation for some of the $157 million difference is that the General Partner had to invest further Partnership funds after acquisition had been approved by Lehman's Investment Committee *but before acquisition by LBREP III*.  Furthermore, these additional expenditures concerning which LBREP III failed to notify investors were substantial and some were made so close to the Supplemental PPMs that it is not credible that the Defendants were unaware that they would take place.  An example is the Rightway China transaction.  The November 28, 2007 Supplemental PPM stated:  "On October 31, 2007, Lehman Brothers received Investment Committee approval to invest $37.4 million equity in a private placement in Rightway China Real Estate Development Company Limited, a leading residential property developer headquartered in Dalian, to fund the expansion of the Rightway portfolio."  In fact, Rightway's bank financing had collapsed and Lehman had apparently agreed to step up and assume a $58,226,400 debt obligation in addition to the amount approved for investment in the property, and the first $23.5 million of which was paid on December 11th, less than two weeks after the publication of the November 28th Supplemental PPM.  Subsequently, there were five other Supplemental PPMs, but none mentioned this increased expenditure.  There were other examples as well, yet, all of the substantial additional investments were omitted from disclosure to investors in the PPMs or Supplemental PPMs prior to transfer to LBREP III.

84.    The total amount of omitted but required expenditures was a material fact that would be a substantial factor for investors in deciding to invest, based on the following:  LPAs Section 6.13 states, subject to certain provisos, that "Any such Portfolio Investments in Progress may be transferred to the Partnership at its acquisition cost plus Lehman Brothers' cost of carry not to exceed 9% per annum."  But even if Lehman's costs of carry were as high as 9% per annum, which is doubtful as Insider Defendants quoted 2.5% over LIBOR, the total investment *exceeded even that 9% carrying cost by more than $110 million*.  Furthermore, that computation of a 9% carry factor assumes that Lehman acquired the investments on the dates the purchases

were authorized by its Investment Committee, when, actually, many required months to "close." Further, during the period from April of 2007, when the first of the Subject Investments was approved for acquisition, until the end of May 2008, when they were transferred to LBREP III, the LIBOR rate ranged from a high of 5.3% to a low of 2.5%.

85.     The $157 million undisclosed discrepancy which LBREP III partnerships were required to pay, of which $110 million exceeds a 9% carry factor over acquisition prices, arose out of self-dealing transactions as defined in the Investment Advisor Act of 1940.  The Supplemental PPMs, which only referred to the "possibility" of the 26 property transactions until May 2008, only provided thumbnail sketches of the possible property investments and omitted to disclose the true prices being paid for the properties or the huge short-term debt obligations associated with them.  Such cursory disclosure is insufficient to constitute any (i) written consent prospectively authorizing the completion of such self-dealing transactions, (ii) after *full disclosure* including pricing to enable the client to make an *informed decision* to consent to the transaction, with (iii) Investment Advisor and affiliated parties acting in the best interests of the client.  Thus, the Insider Defendants' brief descriptions failed to obtain any consent of Plaintiffs or LBREP III investors to the terms of the transfers of the 20 Subject Properties which collectively constitute the $157 million difference from Lehman's disclosed acquisition prices, contrary to the requirements of the Investment Advisor Act of 1940.  Plaintiffs were harmed when the concealed risk -- that Insider Defendants would engage in self-dealing transactions without obtaining investor consent or submitting to an IAC review,-- materialized to expend substantially greater amounts in the investments than Plaintiffs and other investors knew or expected.  Insider Defendants derived a personal benefit from these fraudulent practices as Lehman was able to pass all the undisclosed amounts on to investors, thus supporting Lehman's stock price, as multiple Insider Defendants were selling personal holdings of Lehman stock during 2008 near the time of the property transfers, as shown by SEC disclosures.

86.     As Plaintiffs came to learn, the Partnerships paid undisclosed and unanticipated

amounts on account of at least 20 Subject Investments, exceeding the purchase prices stated in Supplemental PPMs as follows (prices are in U.S. dollars as reported in Supplemental PPMs):

        a.        In the 200 Fifth Avenue Syndication Partners JVLP transaction, the investment was initially acquired for $22.5 million, and the acquisition was approved by Lehman Brothers on April 20, 2007.  On May 28, 2008, it was transferred to LBREP III for the price of $24.5 million, or $2 million more than the reported acquisition price.

        b.        The DHM Salt Lake City Hotel investment was acquired for $13.2 million, and approved by Lehman on December 3, 2007.  On May 28, 2008, the property was transferred to LBREP III for $13.3 million, or $100,000.00 more than the acquisition price.

        c.        In the DHM Seattle Hotel, L.P. transaction, the investment was acquired for $9.3 million, approved by Lehman on April 3, 2007.  On May 28, 2008, it was transferred to LBREP III for $9.6 million, or $300,000.00 more than reported acquisition price.

        d.        In the St. Joe Office Portfolio transaction, the investment was acquired for $11.1 million, and approved by Lehman on June 21, 2007.  On May 28, 2008, that property was transferred to LBREP III for $11.7 million, or $700,000.00 more than acquisition price.

        e.        The West 44th Street Project LLC transaction was acquired for $40 million, and approved by Lehman on June 21, 2007.  On May 28, 2008, it was transferred to LBREP III for $45.6 million, or $5.6 million more than reported acquisition price.

        f.        The Chancerygate (Business Centres) property was acquired for $60 million, and approved by Lehman on June 20, 2007.  On May 28, 2008, it was transferred to LBREP III for $62.1 million, or $2.1 million more than the reported acquisition price.

        g.        The UK Residential Platform property was acquired for $33.7 million, and approved by Lehman on October 3, 2007.  On May 28, 2008, that property was transferred to LBREP III for $62 million, or $28.3 million more than the reported acquisition price.

        h.        The Atemi SAS property was acquired for $57.1 million, and approved by Lehman on June 27, 2007.  On May 28, 2008, that property was transferred to LBREP III for the

ATL_IMANAGE-6887589.1

price of $59.1 million, or $2 million more than the reported acquisition price.

i.      In the Bogtodorsk Residential, Poland transaction, the property investment was initially acquired for $7.9 million, and the acquisition was approved by Lehman on October 17, 2007.  On May 28, 2008, that property was transferred to LBREP III for the price of $9.8 million, or $1.9 million more than the reported acquisition price.

j.      The Chrysalis SpA (Italy)property was acquired for $15.9 million, and approved by Lehman on October 25, 2007.  On May 28, 2008, that investment was transferred to LBREP III for $18.2 million, or $2.3 million more than the acquisition price.

k.      The Fondi Immobilari Italianai property was acquired for $30.9 million, and approved by Lehman on December 4, 2007.  On May 28, 2008, it was transferred to LBREP III for $31.4 million, or $500,000 more than the reported acquisition price.

l.      The Gdansk, Poland property was acquired for $12.1 million, and approved by Lehman on January 7, 2008.  On May 28, 2008, that property was transferred to LBREP III for $14.5 million, or $2.4 million more than the reported acquisition price.

m.      The Latvia Residents Portfolio property was acquired for $36.5 million, and approved by Lehman Brothers on April 25, 2007.  On May 28, 2008, it was transferred to LBREP III for $41.8 million, or $5.3 million more than the reported acquisition price.

n.      The Marsailles Portfolio property was acquired for $130.5 million, and approved by Lehman on November 15, 2007.  On May 28, 2008, that property was transferred to LBREP III for $154.7 million, or $24.2 million more than the acquisition price.

o.      The Timisoara Residential property was acquired for $11.5 million, and approved by Lehman on October 17, 2007.  On May 28, 2008, that property was transferred to LBREP III for $21.5 million, or $10 million more than the reported acquisition price.

p.      The Vesta Portfolio - Germany investment was acquired for $127.9 million, approved by Lehman on September 19, 2007.  On May 28, 2008, it was transferred to LBREP III for $144.8 million, $16.9 million more than the reported acquisition price.

q.      The ALAM Chungdu investment was acquired for $18.5 million, and approved by Lehman Brothers on January 30, 2008.  On May 28, 2008, it was transferred to LBREP III for $18.6 million, or $100,000.00 more than the reported acquisition price.

r.      The Clemenceau Mauritius investment was acquired for $17.6 million, and approved by Lehman on June 25, 2007.  On May 28, 2008, that property was transferred to LBREP III for $18.9 million, or $1.3 million more than the reported acquisition price.

s.      The Greater Tokyo Office Portfolio investment was acquired for $58.8 million, and approved by Lehman on February 7, 2008.  On May 28, 2008, it was transferred to LBREP III for $61.9 million, or $3.1 million more than the reported acquisition price.

t.      Finally, in the Rightway China investment was acquired for $37.4 million, and approved by Lehman on October 30, 2007.  On May 28, 2008, it was transferred to LBREP III for $85.8 million, or $48.4 million more than the reported acquisition price.

87.      The following table (i) compares amounts invested by LBREP III Partnerships to prices previously paid by Lehman, and (ii) compares invested amounts to prices paid by Lehman plus a 9% cost of carry from October 1, 2007.  The table itemizes, by property, the amounts which collectively constitute the $157 million difference in required LBREP III investment in 20 Subject Properties transferred to Partnerships, omitted from Supplemental PPMs' brief transaction descriptions.  Such material omissions could not result in *informed* consent of Plaintiffs or LBREP III investors, as required by of the Investment Advisor Act of 1940.

\\
\\
\\
\\
\\

### Amounts Paid by LBREP III Undisclosed for Investor Consent (US$ millions)

| Real Estate Equity Investments | Date Acquisition Approved by Lehman Brothers | Date Acquired by LBREP III | Elapsed Time in Years | Price Paid by Lehman Per Supp. PPM | Total Amount Paid by LBREP III | Excess over Disclose Price | Lesser of 9% Carry Value on Cost or Markup |
|---|---|---|---|---|---|---|---|
| | | *Relevant Time Issues* | | *Prices Paid per Supp. PPMs in US$ Compared to Financial Statements* | | | |
| **_U.S. Properties_** | | | | | | | |
| 200 Fifth Avenue Syndication Partners JVLP | 4/20/2007 | 5/28/2008 | 1.107 | 22.5 | 24.5 | 2.0 | 2.0 |
| 1001 McKinney Houston | 10/30/2007 | 5/28/2008 | 0.578 | 22.9 | 22.9 | - | - |
| Aldi Senior Housing I, LLC | 6/21/2007 | 5/28/2008 | 0.937 | 29.7 | 29.7 | - | - |
| DHM Salt Lake City Hotel, LP | 12/3/2007 | 5/28/2008 | 0.485 | 13.2 | 13.3 | 0.1 | 0.1 |
| DHM Seattle Hotel, LP | 4/3/2007 | 5/28/2008 | 1.153 | 9.3 | 9.6 | 0.3 | 0.3 |
| Ridge at Crescent Cove | 11/5/2007 | 5/28/2008 | 0.562 | 10.4 | 10.4 | - | - |
| St. Joe Office Portfolio | 6/21/2007 | 5/28/2008 | 0.937 | 11.1 | 11.7 | 0.6 | 0.6 |
| Garage Investors, LLC | 4/30/2007 | 5/28/2008 | 1.079 | 13.8 | 13.8 | - | - |
| West 44th Street Proj. LLC | 7/17/2007 | 5/28/2008 | 0.866 | 40 | 45.6 | 5.6 | 3.1 |
| Subtotals US: | | | | 172.9 | 181.5 | 8.6 | 6.1 |
| **_UK Properties_** | | | | | | | |
| Chancerygate (Business Centres) Limited | 6/20/2007 | 5/28/2008 | 0.940 | 60 | 62.1 | 2.1 | 2.1 |
| UK Residential Platform | 10/3/2007 | 5/28/2008 | 0.652 | 33.7 | 62.0 | 28.3 | 2.0 |
| Subtotals UK: | | | | 93.7 | 124.1 | 30.4 | 4.1 |
| **_Continental Europe Properties_** | | | | | | | |
| Atemi SAS (French Office Platform) | 6/27/2007 | 5/28/2008 | 0.921 | 57.1 | 59.1 | 2.0 | 2.0 |
| Bogtodorsk Residential, Poland | 10/17/2007 | 5/28/2008 | 0.614 | 7.9 | 9.8 | 1.9 | 0.5 |
| Chrysalis SpA (Italy) | 10/25/2007 | 5/28/2008 | 0.592 | 15.9 | 18.2 | 2.3 | 0.9 |
| Fondi Immobilari Italiani SGR SpA (Italy) | 12/4/2007 | 5/28/2008 | 0.482 | 30.9 | 31.4 | 0.5 | 0.5 |
| Gdansk, Poland | 1/7/2008 | 5/28/2008 | 0.389 | 12.1 | 14.5 | 2.4 | 0.5 |
| Latvia Residents Portfolio | 4/25/2007 | 5/28/2008 | 1.093 | 36.5 | 41.8 | 5.3 | 3.7 |
| Marsailles Portfolio | 11/15/2007 | 5/28/2008 | 0.534 | 130.5 | 154.7 | 24.2 | 7.1 |
| Timisoara Residential (Rumania) | 10/17/2007 | 5/28/2008 | 0.614 | 11.5 | 21.5 | 10.0 | 0.8 |
| Vesta Portfolio - Germany | 9/19/2007 | 5/28/2008 | 0.690 | 127.9 | 144.8 | 16.9 | 7.9 |
| Subtotals Europe: | | | | 430.3 | 495.8 | 65.5 | 23.8 |

ATL_IMANAGE-6887589.1

| Asia Properties | | | | | | | |
|---|---|---|---|---|---|---|---|
| ALAM Various China | 7/9/2007 | 5/28/2008 | 0.888 | 4.5 | 4.5 | - | - |

| Real Estate Equity Investments | Date Acquisition Approved by Lehman Brothers | Date Acquired by LBREP III | Elapsed Time in Years | Price Paid by Lehman Per Supp. PPM | Total Amount Paid by LBREP III | Excess over Disclose Price | Lesser of 9% Carry Value on Cost or Markup |
|---|---|---|---|---|---|---|---|
| ALAM Chungdu Master | 1/30/2008 | 7/15/2008 | 0.458 | 18.5 | 18.6 | 0.1 | 0.1 |
| Bangkok Serviced Apt. Portfolio | 11/1/2007 | 5/28/2008 | 0.573 | 14.7 | 14.4 | (0.3) | - |
| Clemenceau Mauritius Holdings (Singapore) | 6/25/2007 | 5/28/2008 | 0.926 | 17.6 | 18.9 | 1.3 | 1.2 |
| Greater Tokyo Office Portfolio | 2/7/2008 | 5/28/2008 | 0.304 | 58.8 | 61.9 | 3.1 | 1.7 |
| Rightway China Real Estate Limited | 10/30/2007 | 5/28/2008 | 0.578 | 37.4 | 85.8 | 48.4 | 4.2 |
| Subtotals Asia: | | | | 151.5 | 204.1 | 52.6 | 7.1 |
| **Grand Total Real Estate Investments** | | | | 848.4 | 1,005.5 | 157.1 | 41.2 |

# CLAIMS FOR RELIEF

## COUNT I

### (Section 10(b) of the 1934 Securities Exchange Act and Rule 10b5)

88.     Plaintiffs repeat and re-allege each allegation set forth herein.

89.     As alleged above, the General Partner and the Investment Advisor, by and through their agents including the Individual Defendants, each with conscious misbehavior and/or recklessness, misrepresented material facts and omitted to state material facts in connection with the sale of interests in the Partnerships to Plaintiffs, which were intended to and did deceive the Plaintiffs, for the purpose of inducing Plaintiffs to invest in the Partnerships in order to fund the transfers of the Subject Investments at inflated prices without disclosure of material terms or obtaining the consents required for such self-interested transactions. Defendants' misrepresentations and omissions of material fact proximately caused Plaintiffs justifiably to rely thereon and to invest in the Partnerships and thereby suffer foreseeable losses by unknowingly funding Defendants' self-dealing transfer transactions of Subject Investments at

grossly inflated prices.

90.     The Defendants owed Plaintiffs a duty to avoid omissions and misrepresentations of material facts regarding their investments and the General Partner's intentions with regard to the Subject Investments under Section 10(b) of the Securities Act of 1934 and Rule 10b-5 thereunder, and LPAs Section 6.13 governing the General Partner's conduct with respect to transfers of Portfolio Investments in Progress.

91.     The Defendants made these misrepresentations and omissions knowingly, or at least with reckless disregard for the truth and materiality thereof, for the purpose of inducing Plaintiffs to invest in the Partnerships and allow Defendants to convey away numerous legacy properties and remove their inherent losses from Lehman's financial statements during the financial crisis that led to Lehman's bankruptcy.  Furthermore, Defendants made these misrepresentations and omissions with intent to deceive or defraud the Plaintiffs with respect to Defendants' investment objectives for the Partnerships, and the material terms (including actual Fair Value) which pertained to acquisition of the Subject Investments.

92.     The Defendants' misrepresentations and omissions were made in connection with a purchase or sale of securities, as the deceptive practices alleged herein persuaded the Plaintiffs to invest in the Partnerships in ignorance of the Defendants' scheme sell the Subject Investments to the partnership at inflated prices and without disclosure of material terms or consent.  Rather than benefiting the Partnerships, the Subject Investments served to benefit the Defendants and Lehman Brothers, and to serve their interests over and above those of the Partnerships, in contravention of said section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

93.     The Defendants made the misrepresentations and omissions by means of the U.S. mails, the Internet and electronic mail.

94.     Plaintiffs reasonably relied upon the Defendants' misrepresentations in light of Lehman Brothers' reputation in the investment community and real estate securities market and the reasonableness of the partnership purposes and investment strategies as stated in marketing

materials, the PPMs and the LPAs.  As a consequence of their reliance, Plaintiffs invested in the Partnerships and were foreseeably and proximately caused the losses to the value of their investments by the General Partner.  Additionally, the General Partner's omissions of material fact created a misimpression as to the General Partner's management and investment strategies, which induced Plaintiffs to invest in the Partnerships in ignorance of the Defendants' scheme to transfer investments to the Partnerships at inflated prices without disclosure or consent, or to fail to form an IAC until too late, after the overpriced "warehoused" properties had been transferred and issues of appropriate valuation and investor consent had become moot.

95.      Defendants' material misrepresentations and omissions proximately caused Plaintiffs to suffer monetary damage by diminution in the value of their limited partnership interests, capital contributions made to the Partnership, unreasonable management fees paid to the General Partner during the relevant time period, and other damages according to proof.

## COUNT II

### (Rescission under Securities Exchange Act of 1934, Section 29(b))

96.      Plaintiffs repeat and re-allege each allegation set forth herein.

97.      Plaintiffs entered into contracts with Defendants General Partner, Investment Advisor and REPE directly, and indirectly with the Insider Defendants, on or about November 27-30, 2007 upon signing their respective Subscription Agreements and becoming admitted as limited partners to their respective Partnerships.

98.      Each such contract entered into by Plaintiffs was made in violation of Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder, due to the misrepresentations and omissions of material facts as hereinabove alleged.  Furthermore, each such contract has involved performance of violations of said Section 10(b) and Rule 10b-5, since, without limitation thereby, representations such as the (i) future searches for opportune property investments that should appear in the market for use of investor funds, and (ii) the formation of an IAC to scrutinize transactions for conflict of interest and fair valuation in the

interests of investors.

99.     Section 29(b) of the Securities Exchange Act of 1934 provides that any such contract (i) made in violation of, or (ii) involving performance thereof that violates, said Section 10(b) or Rule 10b-5, shall be void as regards the rights of any person who, in violation thereof, shall have made or engaged in the performance of any such contract.

100.    None of the contracts entered into by Plaintiffs are executory, but rather have been performed by them in the contribution of capital and payment of management fees to the Partnerships in response to Defendant General Partner's Capital Calls and Notices of Management Fees Due.

101.    Plaintiffs' remedy at law is inadequate due to (i) the difficulty of calculating exact damages resulting from the transfer to their Partnerships of the Subject Investments at exorbitant prices, (ii) the Plaintiffs' unwillingness to continue in a partnership managed by persons among the Insider Defendants already proven to disregard their fiduciary duties, and shown to act fraudulently and in their own interest at the expense of those to whom fiduciary duties are owed, and (iii) the fact that LBREP III partnership interests are illiquid investments not capable of transfer on any efficient market or securities exchange, leaving Plaintiffs little choice but to continue in a fiduciary relationship with distrusted investment managers of Plaintiffs' savings.

102.    Rescission and restitution of funds invested is the appropriate remedy because the fraud of Defendants was not collateral to, but rather of central materiality to Plaintiffs, who invested in the LBREP III partnerships primarily to associate with a highly reputable investment banker, but who came to realize that Defendants had indeed defrauded them for Lehman's profit.

103.    Rescission and restitution of funds invested is also appropriate because the equities balance much more strongly in favor of Plaintiffs, who are primarily or exclusively non-professional, individual investors who invested their personal savings and now wish to have the security of their savings attended to by persons who did not defraud them.  There is no inequity to Defendants from a rescission remedy, because Defendants knowingly undertook a fraudulent

ATL_IMANAGE-6887589.1

scheme to further their own interests.  There is also no inequity that would result to other LBREP III investors, as Plaintiffs have offered all investors the opportunity to join them in maintaining this action, and those who elected to hold their investments have an opportunity to benefit from proportionately larger shares of the ultimate proceeds of LBREP III.

104.     Rescission is also appropriate because Plaintiffs are in privity of contract with the Defendant General Partner, because Insider Defendants sold their own Lehman Brothers' securities to take advantage of the fraud.

## <u>COUNT III</u>
**(Violation of Section 20 of the Exchange Act, against Defendants Walsh, Bossung, Newman, Fuld, Gregory, O'Meara, Odrich, Callan Russo and Littow)**

105.     Plaintiffs repeat and re-allege each allegation set forth herein.

106.      Defendants Walsh, Bossung, Newman, Fuld, Gregory, O'Meara, Odrich, Callan and Littow each acted as a controlling person of the General Partner within the meaning of Section 20 of the Exchange Act, as alleged herein.  By virtue of their high-level positions, and their participation in and/or awareness of Lehman Brothers' operations and/or intimate knowledge of and access to adverse undisclosed information about Lehman Brothers' business, operations, operational trends, financial statements and markets, and those of Lehman Brothers' partnerships, via access to internal corporate documents (including the operating plans, budgets, forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to them, the foregoing Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the General Partner, including the content and dissemination of false and misleading statements of material facts and omissions.  Defendants Walsh, Bossung, Newman, Fuld, Gregory, O'Meara, Odrich, Callan, Russo and Littow were provided with or had unlimited access to copies of the PPM, the Supplements thereto, and other documents alleged herein, and

they were aware, or recklessly disregarded, that false or incomplete and misleading statements were being issued regarding the Partnerships and their investments, and had the ability to prevent issuance of the statements or to correct them.  Instead, these Defendants approved or ratified the false and misleading statements in violation of the federal and state securities laws.

107.    Further, Defendants Walsh, Bossung, Newman, Fuld, Gregory, O'Meara, Odrich, Callan, Russo and Littow were officers of Lehman Brothers and/or had supervisory involvement in the day to day operations of the company and, therefore, are presumed to have had the power to control or influence the particular transactions and statements giving rise to the securities violations as alleged herein, and exercised that control as alleged herein.

108.    As alleged above, the General Partner violated the securities laws by the acts and omissions alleged in this complaint. By virtue of their positions as controlling persons of the General Partner, Defendants Walsh, Bossung, Newman, Fuld, Gregory, O'Meara, Odrich, Callan Russo and Littow are therefore liable to Plaintiffs pursuant to Section 20 of the Exchange Act.

109.    As a direct and proximate result of Defendants Walsh, Bossung, Newman, Fuld, Gregory, O'Meara, Odrich, Callan and Littow's conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT IV
### (Bad Faith Breaches of Fiduciary Duty under New York and Delaware law)

110.    Plaintiffs repeat and re-allege each allegation set forth herein.

111.    Each of the Defendants, in their capacities alleged herein, owed fiduciary duties of loyalty, care, and good faith to the Partnerships and to Plaintiffs, as Limited Partners of the LBREP III limited partnerships and owners and purchasers of Lehman Brothers securities.

112.    Among the fiduciary duties of loyalty, care and good faith owed by Defendants to Plaintiffs were the duties to:

a.    make full and timely disclosure of all material facts pertaining to LBREP III and their investments;

b.    apply Fair Valuation principles of FASB Statement No. 157 in valuing the

investments for transfer to and held by LBREP III and comply with GAAP;

    c.    obtain the informed consent of LBREP III investors prior to transferring properties to the limited partnerships in transactions in which Defendants acted as a principal (seller);

    d.    form an IAC as required by the Investment Advisers Act of 1940 and as promised in the PPMs and LPAs to consult with on issues of conflicts of interest in transactions with LBREP III and of appropriate valuations of properties to be transferred thereto.

113.    In making the Subject Investments against the best interests of the Partnerships, and committing the actions and omissions alleged hereinabove, both prior to and continuing after Plaintiffs had invested in LBREP III, the Defendants, and each of them, breached their fiduciary duties to the Plaintiffs.

114.    Furthermore, General Partner and the Individual Defendants, in failing to create the IAC, thereby depriving the Partnerships and Plaintiffs of the benefit of the judgment of the other partners in reviewing Defendants' conflicts of interest and the appropriate valuations and investments of the Partnerships, breached their fiduciary duties to the Plaintiffs.

115.    The General Partner and the Individual Defendants, acting on behalf of the General Partner, breached their fiduciary duties to Plaintiffs by omitting to disclose the plan to transfer legacy Lehman investments to LBREP III for an immediate and substantial loss for Plaintiffs, failing to timely report the transfers to investors, failing to form an IAC to consider the conflicts of interest of Defendants in transferring, as principal (seller) the Subject Investments or otherwise to obtain the informed consent of investors to such transactions, and otherwise as alleged hereinabove failing to abide by their duties of loyalty, care and utmost good faith.

116.    The above-alleged breaches of fiduciary duties were undertaken and committed by Defendants intentionally and in bad faith, by willful misconduct, intentional fraud and by gross negligence, in knowing disregard of Plaintiffs' rights under the LPAs.  Defendants acted in

ATL_IMANAGE-6887589.1

bad faith and committed willful misconduct by knowingly and purposefully acting inconsistently with the overall purpose of the LBREP III partnerships as stated in the PPMs.

117.    The above-alleged breaches of fiduciary duties violate Defendants' duties under both Delaware and New York law.

118.    As a direct and proximate result of all Defendants' conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

<u>COUNT V</u>
**(Violation of Delaware Securities Anti-Fraud Statute, 6 Del. C. § 7303)**

119.    Plaintiffs repeat and re-allege each allegation set forth herein.

120.    In making material misrepresentations and omissions of fact in connection with the purchase and sale of the limited partnership interests in the Partnerships, knowingly or with reckless disregard for the truth thereof, the General Partner and the Individual Defendants violated 6 Del. C. Section 7303.

121.    Plaintiffs reasonably relied on the misrepresentations and omissions.

122.    The material misrepresentations and omissions proximately caused Plaintiffs to suffer monetary damage in the form of diminution in value of their limited partnership interests in the Partnerships, capital contributions made to the Partnership, unreasonable management fees paid to the General Partner, and other damages according to proof.

<u>COUNT VI</u>
**(Fraudulent Misrepresentation Under New York Law)**

123.    Plaintiffs repeat and re-allege each allegation set forth herein.

124.    Defendants represented to the Plaintiffs that, among other things, the General Partner would act in the best interests of the Partnerships in making investment decisions, and that the Partnerships' investment strategy would be to maximize returns on the Partnerships' investments.  The General Partner and the Individual Defendants further represented to Plaintiffs that (A) it would create an Investor Advisory Committee to review and (i) consider the fairness to investors of certain proposed investments in self-dealing transactions for possible waiver of

conflicts of interest on their behalf, or to (ii) consider write-downs of investments such proposed investments that had declined in value, and that (B) it would not engage in transfers of Portfolio Investments in Progress without first disclosing them to the Partnerships and obtaining consent either of the Limited Partners before they invested or the Investors Advisory Committee.

125.    The Individual Defendants were authorized to speak for the General Partner as Managing Directors of LBREP III and members of the Investment Committee and/or principals of Lehman Brothers.  The Individual Defendants were responsible for or involved in the drafting and/or review and approval of the Limited Partnership Agreements and the PPMs and supplements thereto, which contained the above-described representations.

126.    The Defendants' representations were false.

127.    The Defendants made the representations with knowledge of their falsity, reckless disregard for their truth, or without reasonable grounds for believing the representations to be true when they were made.

128.    The Defendants intended that Plaintiffs would rely on the representations in deciding whether to invest in and become partners of the Partnerships

129.    Plaintiffs reasonably relied on the Defendants' representations.

130.    Plaintiffs suffered harm by the immediate diminution of the value of their investments upon Defendants' completion of the transfers of the Subject Investments from Lehman Brothers to LBREP III in self-dealing transactions at inflated prices without disclosure of material terms or obtaining informed consents therefor.

131.    Plaintiffs' reliance on the Defendants' representations was reasonable and justifiable, and was a substantial factor in causing their harm, as the representations contributed to the information available to Plaintiffs at the time they decided to invest in the Partnerships.

## COUNT VII
### (Concealment under New York law)

132.    Plaintiffs repeat and re-allege each allegation set forth herein.

133.    The General Partner, Investment Advisor and the Individual Defendants, acting in

ATL_IMANAGE-6887589.1

concert with each other and on behalf of the General Partner, were in a fiduciary relationship with Plaintiffs by virtue of their relationship as business partners.  Defendants intentionally failed to disclose and actively concealed from Plaintiffs, at the time of the investments and thereafter, material information regarding the Subject Investments, including but not limited to the diminished Fair Value, and inflated prices at which the properties would be transferred from Lehman Brothers to the Partnerships, without benefit of independent review of an IAC.

134.    Alternatively, Plaintiffs allege that the General Partner and Individual Defendants disclosed some facts to Plaintiffs regarding the Subject Investments but intentionally failed to disclose other material facts regarding those transactions, making the disclosure deceptive.

135.    Plaintiffs did not know of the concealed facts regarding the Subject Investments.

136.    The General Partner and the Individual Defendants intended to deceive Plaintiffs by concealing the material information from Plaintiffs regarding the Subject Investments.

137.    Plaintiffs reasonably relied on the deception, in light of the Defendants' fiduciary relationship with the General Partner, the promises in the PPM to make investment decisions in the best interest of the Partnerships and with the goal of maximizing investment value, and the representations by the General Partner and Individual Defendants in the PPM about Lehman Brothers' positive reputation in the real estate investment market at the time.

138.    Plaintiffs were harmed as a result of the Defendants' deception as alleged above.

139.    The Defendants' concealment was a substantial factor in causing Plaintiffs' harm.

## COUNT VIII
### (Willful Breach of Covenant of Good Faith and Fair Dealing)

140.    Plaintiffs repeat and re-allege each allegation set forth herein.

141.    The contractual relationship between Plaintiffs and the General Partner included an implied covenant of good faith and fair dealing, which requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract.  A breach of the covenant of good faith and fair dealing may occur even without violating an express term of the contract.

ATL_IMANAGE-6887589.1

142.    Defendants violated the implied covenant of good faith and fair dealing in the LPAs, where Lehman conveyed the Subject Properties to LBREP III partnerships without obtaining investors' consent and without adequate disclosure or without forming an IAC to consider the inherent conflict of the transactions in which Lehman acted as principal (seller), and Defendants' said actions were undertaken in bad faith, for the sole purpose of benefiting the General Partner in disregard of the limited partners' rights to disclosure and consent under the contract.  In effect, Lehman's conduct forced the limited partnership to purchase the investments for amounts far above the fair market value.

143.    Defendants' conduct was done in bad faith, by willful misconduct, fraud and gross negligence, and deprived the Plaintiffs of a number of bargained-for benefits of the LPAs, and therefore breached the duty of good faith and fair dealing.

## COUNT IX
### (Aiding and Abetting Fraud Violations, against Defendants Walsh, Bossung, Newman, Fuld, Gregory, O'Meara, Odrich, Callan, Russo, and Littow)

144.    Plaintiffs repeat and re-allege each allegation set forth herein.

145.    Defendants Walsh, Bossung, Newman, Fuld, Gregory, O'Meara, Odrich, Callan Russo, and Littow aided and abetted the General Partner in committing fraud and the wrongful acts alleged herein upon Plaintiffs by their active participation, aid, encouragement and/or ratification of the fraud alleged in the complaint, for their own benefit.

146.    Specifically, Defendants Walsh, Bossung, Newman, Fuld, Gregory, O'Meara, Odrich, Callan, Russo, and Littow aided and abetted the wrongful acts of the General Partner by failing to disclose the General Partner's misrepresentations of material facts and omissions of material facts in connection with the sale of interests in the Partnerships to Plaintiffs, which misrepresentations and omissions were intended to and did deceive the Plaintiffs, for the purpose of inducing Plaintiffs to invest in the Partnerships in order to fund the transfers of the Subject Investments at inflated prices without disclosure of material terms or obtaining the consents required for such self-interested transactions. Further, these Defendants failed to disclose the

General Partner's exposure to losses from its real estate related investments and its failure to write down real estate investments to reflect their true value.  Additionally, these Defendants aided and abetted the fraudulent and wrongful acts alleged herein by participating in the management of the company, being directly involved in day-to-day operations at the highest levels, and participating in the drafting, producing, reviewing and/or disseminating of the false and misleading PPM, the Supplements thereto, and other documents alleged herein.  Moreover, these Defendants were aware, or recklessly disregarded, that false and misleading statements were being issued regarding the Partnerships and their investments, and approved or ratified these statements in violation of the federal and state securities laws.  Each such Defendant was provided with copies of the misleading documents prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or correct them, and failed to do so.

147.    The acts of the aforementioned Defendants constitute active participation, aid, encouragement, or ratification of the committing of fraud and other wrongful acts alleged herein, by the Defendants upon the Plaintiffs, as alleged above.

148.    The participation, aid, encouragement and/or ratification of Defendants Walsh, Bossung, Newman, Fuld, Gregory, O'Meara, Odrich, Callan, Russo, and Littow of the committing of the wrongful acts alleged herein upon Plaintiffs was done for their benefit, to protect their compensation as officers and employees of Lehman Brothers.

149.    Defendants' said conduct was done in bad faith, by willful misconduct, fraud and gross negligence, and was intentional in all respects, and done with the intention to act together and conspire to deprived the Plaintiffs of a substantial amounts of their investment funds in order to serve the selfish interests of  Defendants individually.

150.    By virtue of the foregoing Defendants' conduct in aiding and abetting the fraud and other wrongful acts as alleged herein, Plaintiffs have suffered economic harm in an amount to be proven at trial and the Defendants are jointly and severally liable therefor.

## COUNT X

**(Fraud and Contract Breach under N. Y. Law against Defendants Walsh, Bossung, Newman, General Partner, Investment Advisor, REPE, LegacyCo Advisor, ManageCo)**

151.    Plaintiffs repeat and re-allege each allegation set forth herein.

152.    LPAs Section 7.3 provides that each Limited Partner "shall pay directly to the General partner (or its designated affiliate) a management fee at the rates <u>per annum</u>  . . .for the period between the Initial Closing and the date of the Final Distribution (the 'Management Fee')" of such Limited Partner's Capital Commitment.  The annual percentage rates varied among the eleven LBREP III partnerships, but the Fund III rate was 1.75% per annum, and Partners III rate was 1.00% per annum.

153.    The General Partner declared unilaterally that the "Initial Closing" occurred on October 1, 2007, even though no investors had yet purchased any limited partnership interests and there was no Partnership property to manage. The actual Initial Closing took place on November 30, 2007, two months later.  By fraudulently claiming that the Initial Closing occurred on October 1, 2007, the General Partner was able to collect Management Fees for the months of October and November, 2007 to which it was not entitled.  These Management Fees for that two month period would be substantially in excess of $2 million.

154.    On February 6, 2009, Defendants Bossung and Newman, on behalf of the General Partner and REPE, sent a Capital Demand and Management Fee Notice to limited partners.  The Notice stated that the Management Fee was "calculated based only on total committed capital on *current Portfolio Investments* for the period from January 1, 2009 to June 30, 2009 (the "Subject Period")(Emph. added).  The Notice continued:  "At this time, the General partner is not calling Management Fees associated with Unfunded Capital Commitments "pending finalization of the sale process," presumably referring to the pending purchase from bankruptcy by Defendants Walsh, Bossung and Newman of Lehman's interest in the General Partner.

155.    On February 23, 2009, the General Partner and REPE sent a follow-up Memorandum providing "additional information" to limited partners regarding the capital call of

February 6th.  The Memorandum repeated that Management Fees for the Subject Period were calculated "based only on total committed capital in respect of current Portfolio Investments rather than on . . . full Capital Commitment."  The Memorandum then continued with the following language:  "As a result, the General Partner has significantly *reduced, on a voluntary basis, the Management Fees that would otherwise be payable."*  (Emph. added).

156.    With that language, the General Partner effectively waived and surrendered any further right to charge an additional Management Fee for the Subject Period calculated on a more onerous basis.  Further, the Memorandum's statement, in bold italics above, was a statement on which Plaintiffs relied to their detriment and the General Partner, and its successors, are estopped to deny the waiver that the February 23rd Memorandum clearly accomplishes.

157.    Yet on Sept. 3, 2009, a further "Management Fee Notice" was sent to investors stating that "[a]t this time the General Partner is exercising the right to invoice Management Fees for such period [Subject Period] in accordance with the terms of the Partnership Agreement *less Management Fees already invoiced for such period."* (Emph. added).

158.    In the interim, on or about June 17, 2009, press reports in the Wall Street Journal reported that Defendants Walsh, Bossung and Newman had been approved to acquire the REPE and General Partner's business from the bankruptcy estate of Lehman Brothers.  Plaintiffs are unaware whether such purchase has yet been finalized, or approved by the Bankruptcy Court.  But, on information and belief, it seems evident that Defendants Walsh, Bossung and Newman are attempting to mulct LBREP III partners while defrauding the Bankruptcy Court.  If, *arguendo,* any right to charge fees for the Subject Period would survive the February 23rd Memo, that right should be exercised under the jurisdiction of the Bankruptcy Court.  Still *arguendo,* said Defendants are attempting to defer collection on a hypothetical asset beyond the Bankruptcy Court's jurisdiction for their own personal benefit, rather than that of Lehman's legitimate creditors, including the Plaintiffs.  The fraud elements consist of said Defendants' representations (i) to the Bankruptcy Court that all claims of the debtor are accounted for, but (ii)

to LBREP III investors that a further claim for Subject Period fees still exists, with intent that both the Court and investors rely on their respective representation, with losses on both sides proximately resulting, to said Defendants' personal benefit.  Such arrogance is possible in persons who could pass investment losses on to investors without warning.

159.     But, at least with investors, the fraud cannot succeed because said Defendants cannot escape their own waiver.  They acted on behalf of the General Partner with their February 23rd Memo, and could not acquire any rights superior to that of the transferor General Partner. The waiver and estoppel that would prevent the General Partner from re-billing for an *additional* Management Fee, effectively a 62% increase, also would prevent Defendants including Walsh, Bossung and Newman, and their new entities, LegacyCo Advisor and ManageCo, from charging any further Management Fee for the Subject Period.

160.     In a separate and independent act of delay and deception intended to benefit Defendants Walsh, Bossung and Newman personally, the General Partner failed to comply with its obligations under LPA ¶ 3.1(l) which reads in relevant part:

> [3.1](l) Upon the earliest to occur of: . . . . (ii) the General Partner determining that . . . changes in business conditions make termination of the Commitment Period necessary or advisable . . . the General Partner, upon written notice to all Partners, *shall* cancel all outstanding Capital Commitments to the extent that there are then Unfunded Capital Commitments, in each case subject to the continuation of Capital Commitments to the extent provided in  Section 3.1(i). Upon the cancellation of all then Unfunded Capital Commitments, the Commitment Period shall terminate. (Emph. added)

161.     The LPA term "shall" is significant and indicates mandatory action.  The LBREP III partnership interests were sold to investors based on the GP's Lehman connection, its tens of thousands of employees, 52 offices worldwide, hundreds of real estate professionals, etc.  The Lehman bankruptcy on September 15, 2008 and the "Perfect Storm" in the real estate market, as the Examiner's Report quoted Defendant Walsh, were certainly the "change in business

conditions" referred to in Section 3.1(1) that made "termination of the Commitment Period necessary or advisable" no later than September 15, 2008.  Thus, the Commitment Period should have terminated at the latest on September 15, 2008 and Management Fees should have been adjusted pursuant to Section 7.3(c) from that date – but weren't.  Instead, the General Partner continued to demand payment of Management Fees as though no Lehman bankruptcy or real estate crisis had occurred, and it declared another Capital Call after September 15, 2008 to raise over $400 million.  Termination of the Commitment Period on September 15, 2008, still would have permitted the General Partner to call 20% of the original Capital Commitments, another $640 million, leaving less than $240 million available for additional Capital Contributions – not the $350 million the GP now proposes to demand.

162.   Plaintiffs have been irreparably and unfairly damaged in an amount to be proved at trial, as General Partner, REPE, Walsh, Bossung, Newman, LegacyCo Advisor and ManageCo have failed in their duty under LPA ¶3.1(1) and could be similarly damaged if it could charge an additional Management Fee for the period for which Fees have been invoiced to Plaintiffs.

### COUNT XI
**(Declaratory Relief Concerning Management Fees against General Partner, Investment Manager, REPE, Walsh, Bossung, Newman, LegacyCo Advisor, ManageCo)**

163.   Plaintiffs repeat and re-allege each allegation set forth herein.

164.   A dispute has arisen between the Plaintiffs and the Defendants named in this Count VIII, in which said Defendants claim that a further Management Fee is due for the Subject Period as alleged above, while Plaintiffs maintain that said Defendants have no right to charge a further Management Fee for the Subject Period, due to the clear waiver Defendants expressed in the February 23, 2009 Memorandum quoted above.  Plaintiffs further maintain that Defendants are estopped from claiming a further Management Fee for the Subject Period for two reasons:  (i) said Defendants represented to LBREP III limited partners, who relied thereon, that the prior Fee charged was "voluntarily reduced" and in lieu of fees that would "otherwise be payable; and (ii) said Defendants and their affiliates represented to the Bankruptcy Court that all the Debtor

Lehman's assets and rights were before the Court and within its jurisdiction to adjudicate on behalf of Lehman's creditors, of which Plaintiffs are included.

165.     A declaration of the parties' rights and obligations is needed, as the LPAs provide onerous penalties to limited partners for non-payment of Management Fees claimed by the General Partner under LPAs section 9.7(j), including **_forfeiture_** of 50% of their Capital Account balance and 50% reduction in their Percentage Interest in Portfolio Investments.

166.     Plaintiffs have no other reasonable means to determine their rights and obligations with respect to the Management Fees claimed by said Defendants, and need a declaration by this Honorable Court as to their said rights and duties.

### COUNT XII
### (Negligence)

167.     Plaintiffs repeat and re-allege each allegation set forth herein.

168.     The Investment Advisor, General Partner and the Insider Defendants owed Plaintiffs a duty to act with due care in carrying out any transactions on behalf of the Partnerships, and/or in identifying, sourcing, negotiating, structuring, analyzing and effectuating any investments for the benefit of the Partnerships.  Said Defendants further owed Plaintiffs a duty to act with due care in evaluating and managing the assets of the Partnerships. Additionally, Defendants owed Plaintiffs a duty to exercise reasonable care in disclosing the material terms of any transactions engaged in on behalf of the Partnerships within a reasonable period of time, and to correct in an expedient manner any representations regarding such transactions that may have been misleading to the Partners.

169.     In identifying, analyzing, negotiating, structuring, approving and making the Subject Investments, and in failing to disclose the material terms of those transactions in a reasonably expedient manner thereafter, and failing to correct misleading representations regarding the Subject Investments and the management and investment objectives of the Partnerships in general, Defendants breached their duties of care owed to the Plaintiffs.

170.     As a direct result of the Defendants' negligence, Plaintiffs suffered harm in the

amount of their proportionate share of the hundreds of millions of dollars in overpayments paid on the Subject Investments, as well as management fees and other charges paid to the General Partner, in which the Investment Advisor shared, during the period of time that the Defendants acted negligently and breached the numerous duties owed to Plaintiffs.

171.    Defendants' negligence was a substantial factor in causing the above harm.

## COUNT XIII
### (Alternative Derivative Claim)

172.    Plaintiffs repeat and re-allege each allegation set forth herein.

173.    The allegations of this Count XII are intended in the alternative to the theories of recovery alleged above.  These allegations are intended to apply only in the event that the allegations of other Counts are found insufficient and cannot be amended, as a matter of law.

174.    Plaintiffs have repeatedly made demand on Defendants for refunds of investments made into the Partnership and Plaintiffs and have been refused, denied, and rejected, and to the extent any such request has been insufficient to encompass the entire subject matter hereof, it would be useless and futile to attempt any further.

## JURY DEMAND AND PRAYER FOR RELIEF

175.    Plaintiffs hereby demand a trial by jury on all issues.

WHEREFORE, plaintiffs respectfully request the following relief:

A.    Rescission of the LPAs between each Plaintiff and the General Partner, or alternatively, monetary damages restoring each Plaintiff to the position he/she/it would have occupied had the agreements never been made, according to proof;

B.    Alternatively, as pleaded in Count X, Damages for Breaches of Fiduciary Duty to the Lehman-affiliated Partnerships in which Plaintiffs have invested.

C.    Disgorgement of management fees paid to General Partner during the relevant time period, and additional fees paid during the pendency of the action;

D.    Injunctive and Declaratory Relief preventing Defendants from charging a further Management Fee for the Subject Period;

E.      An order directing Defendants to pay reasonable attorneys' fees and costs in connection with this litigation;

F.      Punitive Damages as justified by Defendants' intentional fraud, collective wealth, and a public policy to deter similar fraud by persons similarly situated; and

G.      Such other and further relief as the Court deems just and proper.


DATED:  April 23, 2010                           /s/  *Robert Ted Parker*

                                                 Arthur Russell
                                                 Robert Ted Parker
                                                 *Attorneys for Plaintiffs*

ATL_IMANAGE-6887589.1